John M. Peebles (SBN 237582)
Steven J. Bloxham (SBN 96384)
Michael A. Robinson (SBN 214666)
Tim Hennessy (SBN 233595)
FREDERICKS PEEBLES & MORGAN LLP
2020 L Street, Suite 250
Sacramento, California 95811
Telephone:  (916) 441-2700
Fax:  (916) 441-2067
Email:  jpeebles@ndnlaw.com

*Attorneys for Plaintiff,*
BIG SANDY RANCHERIA ENTERPRISES,
a federally-chartered corporation

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| BIG SANDY RANCHERIA ENTERPRISES, a federally-chartered corporation,<br><br>                    Plaintiff,<br><br>          v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and NICOLAS MADUROS, in his official capacity as Director of the California Department of Tax and Fee Administration,<br><br>                    Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Comes now Plaintiff Big Sandy Rancheria Enterprises ("BSR Enterprises"), a federally-chartered corporation wholly owned by the Big Sandy Rancheria Band of Western Mono Indians (the "Tribe" or "Big Sandy"), a federally recognized Indian tribe, by and through undersigned counsel, and complains of the Defendants as follows:

## **INTRODUCTION**

1.      This action challenges the attempted application to the Tribe and BSR Enterprises by the Defendant Attorney General of certain California State laws implementing the so-called "Master Settlement Agreement" (the "MSA") between the State and major American cigarette

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

1
COMPLAINT

manufacturers, which laws the State has agreed to impose and enforce in order to limit market competition with such cigarette manufacturers from other manufacturers that are not parties to that agreement.

2.     This action also seeks a judgment declaring that, under federal law, the State of California does not have authority to impose certain of its cigarette excise taxes on either the Tribe or BSR Enterprises.

3.     This action also seeks preliminary and permanent injunctions enjoining Defendant from enforcing or attempting to enforce such MSA-related laws and cigarette excise taxes on either the Tribe or BSR Enterprises as this Court shall determine to be beyond the authority of the State to impose or enforce.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1362, in that this is a civil action arising under the Constitution, laws, or treaties of the United States, and this is a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

5.     This action arises under the Constitution, laws, or treaties of the United States, including but not necessarily limited to the following: the Interstate and Indian Commerce Clauses, U.S. Const. art. I, § 8, cl. 2 & 3; the Supremacy Clause, U.S. Const. art. VI, cl. 2; the Indian Trader Statutes, 25 U.S.C. §§ 261-264, and federal common law.

6.     This Court has jurisdiction to grant the declaratory and injunctive relief requested in this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

7.     The Tax Injunction Act, 28 U.S.C. § 1341, does not bar this action because it does not apply to civil actions brought by Indian tribes under 28 U.S.C. § 1362.  *See, e.g., Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470-74 (1976).

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2), in that each of the defendants herein reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

**PARTIES**

9.     Big Sandy Rancheria Enterprises is a federally-chartered corporation, organized and operating pursuant to and in accordance with section 17 the Indian Reorganization Act of June 18, 1934, c. 576, § 17, 48 Stat. 984, 988, 25 U.S.C. § 5124.  BSR Enterprises is wholly owned by the Big Sandy Rancheria Band of Western Mono Indians.  The Tribe is a federally-recognized Indian tribe with offices located on the Big Sandy Rancheria, 37387 Auberry Mission Road, Auberry, CA 93602.  *See* Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 83 Fed. Reg. 4235, 4236 (Jan. 30, 2018).

10.     The Tribe's territory is generally known as the Big Sandy Rancheria or the Big Sandy Indian Reservation.

11.     Xavier Becerra is the Attorney General ("AG") of the State of California ("State"), with offices located at 1300 I Street, Sacramento, CA 95814-2919.  The Attorney General is the chief law enforcement officer in the State.  Cal. Const., art. 5, § 13.  Defendant Becerra is sued in his official capacity.

12.     Nicolas Maduros is the Director of the California Department of Tax and Fee Administration ("CDTFA Director"), with offices located at 450 N Street, Sacramento, CA 95814-4311.  The CDTFA administers the State's cigarette and tobacco products taxes and the State's program for licensing manufacturers, importers, distributors and retailers of cigarettes and tobacco products.  Cal. Rev. & Tax. Code § 30451; Cal. Bus. & Prof. Code § 22790.2; Cal. Gov. Code § 15570.22.  Defendant Maduros is sued in his official capacity.

**GENERAL ALLEGATIONS**

*INTRODUCTION*

13.     This case challenges the most recent manifestation of California's long history of attempting to impose its civil-regulatory laws on Indian tribes and tribal businesses in an effort to dictate the contours of tribal economic development.  Unlike previous regulatory efforts, this one is the direct result of policy decisions at several levels of the California government that have led California to become servile to major American tobacco manufacturers and those manufacturers' threats to withhold billions of dollars from California unless California, and in

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

particular the Office of the Attorney General, effectively eradicates the Tribe's tobacco business through the imposition of arbitrary regulatory restrictions on the type of tobacco the Tribe sells, and by enacting legislation targeting Indian tribes that rely on tobacco sales to fuel their nascent economies.

14.     The seeds for this dispute were planted in the 1990s when 46 states brought separate suits against the largest American cigarette manufacturers and related entities to recover healthcare costs the states claimed they had incurred as a direct result of smoking, as well as corrective action regarding industry tactics such as targeting their products to youth and intentionally covering up the known health impacts of smoking.  California filed its lawsuit in 1997 alleging claims against Philip Morris, Inc.; R.J. Reynolds Tobacco Company; Brown & Williamson Tobacco Corporation; B.A.T Industries, P.L.C.; British American Tobacco Company; Lorillard Tobacco Company, Inc.; American Tobacco Company, Inc.; United States Tobacco Company; Hill & Knowlton, Inc.; The Council For Tobacco Research-U.S.A., Inc.; Tobacco Institute, Inc.; Smokeless Tobacco Council, Inc. ("Big Tobacco"), and seeking recovery of Medi-Cal expenditures, civil penalties and injunctive relief under California's Unfair Competition Law and False Claims Act, as well as the federal Cartwright Act.

15.     California alleged that beginning in 1953, Big Tobacco formed and maintained an illegal combination to restrain and manipulate health information about tobacco and cigarettes and to restrain and limit the development of new products in order to stabilize and/or increase the market for cigarettes and other tobacco products.

16.     Further, California alleged that Big Tobacco combined, conspired, and agreed to unreasonably:  (1) restrain the market for cigarettes and other tobacco products by limiting and suppressing research and information which could have led to product innovations, including making a safer cigarette available to the consuming public, and which could have allowed other manufacturers to lawfully compete against defendants; and (2) limit, misrepresent, and suppress information regarding the health effects of smoking and the addictive qualities of nicotine.

17.     According to the State's allegations, the tools used by Big Tobacco to achieve their goals included: a campaign of disinformation through misrepresenting the health effects of

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

smoking and by suppressing research relating to the dangers of cigarettes, while purporting to provide honest, unbiased information regarding the safety of tobacco and cigarettes; misleading the public about the addictive qualities of nicotine; agreeing among themselves not to conduct individual research on the issue of health and tobacco; and suppression of research, development, and marketing of safer cigarettes.

18. Big Tobacco was alleged to have specifically targeted minors through advertisement and marketing campaigns to induce minors to start smoking cigarettes and to increase cigarette sales to minors.

19. Further, California alleged, knowing that nicotine was addictive, Big Tobacco conducted extensive research and development projects to optimize the delivery of nicotine by using nicotine-rich tobacco blends, by using filtration and ventilation technologies to keep nicotine levels high in low-tar cigarettes, and by using chemical additives to increase the delivery of nicotine to the consumer.

20. Finally, California alleged that through manufacturing and marketing their products, Big Tobacco was guilty of fraud, oppression and/or malice, acted with willful and conscious disregard for the safety of others, including millions of California consumers, by manufacturing and marketing tobacco products knowing that they were dangerously addictive and hazardous to the consumers' health and fraudulently misrepresenting and concealing the risk of nicotine addiction.

21. The very nature and collective impact of California's and its sister states' suits posed a significant threat to the cigarette manufacturers and the massive profits they realized through their rampant fraud and deception. Therefore, using their considerable influence and understanding of the states' interest in raising revenues from any source possible, Big Tobacco convinced the attorneys general of 46 states, including California, to enter into the 1998 Tobacco Master Settlement Agreement ("MSA"). As discussed in the paragraphs to follow, the MSA established a framework for Big Tobacco to make massive payments to the settling states on a long-term basis. In exchange for adding hundreds of millions of dollars – and in California's case, billions of dollars – to the states' revenue streams, Big Tobacco demanded that the states

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

offer them protection from the potential competitive disadvantages that Big Tobacco claimed would result from the payment burdens they accepted in the MSA.  In light of the considerable revenues the states would realize, they were more than willing to comply with Big Tobacco's demands.

22.    In the discussions leading up to this landmark public-private agreement, neither the states' attorneys general nor Big Tobacco's representatives ever invited the participation of federally-recognized Tribal governments ("Tribal governments").   They failed to do so notwithstanding tobacco's ancient and continuing ceremonial and economic significance to Tribal peoples and notwithstanding the vigorous expansion of on-reservation tobacco economies even while the MSA was being negotiated. The global tobacco economy began, after all, when European settlers first encountered "New World" tobacco goods five hundred years ago. Nor did the settling states and Big Tobacco seek the involvement of Congress which, since the adoption of the United States Constitution, exercises exclusive control over commerce with sovereign Indian tribes within its borders, independent of the states.

23.    Despite the fact that sovereign Indian tribes are not subject to state regulation, Big Tobacco and the states crafted the MSA such that it purports to have universal application, even within the boundaries of federally recognized Indian reservations and to commerce involving only Indian tribes.   Thus, the MSA provided that the states – including California – would enforce their cigarette and tobacco laws everywhere within the geographic boundaries of the states, including all federally recognized and/or established Indian reservations.

24.    The result of California's attempt to include Indians and Indian tribes as subjects of the enforcement provisions of the MSA, but otherwise to have excluded them entirely from participation in the MSA, has been uncertainty and confusion with respect to the obligations of tribal and reservation businesses engaged in tobacco commerce, and California's responsibility for controlling that commerce as part of its responsibilities under the MSA. This lack of certainty has led to a series of disputes between tribes and California, and between tribes and other states throughout the country, since 1998. It has also caused Big Tobacco to question whether California has satisfied its obligations under the MSA. Recently, Big Tobacco withheld

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

payments from California for failing to diligently enforce its MSA laws, including over the on-reservation activities of Tribal governments.  The issue of diligent enforcement of the escrow provisions of the MSA was submitted to arbitration, where Big Tobacco's diligent enforcement challenge was to be resolved by a three-person arbitration panel of retired United States judges. This challenge was resolved when California and Big Tobacco entered yet another settlement agreement containing model laws to be enacted that specifically target Tribal governments and their on-reservation activities.  This has left Tribal governments engaged in tobacco commerce, like Big Sandy, to operate with the threat of enforcement hanging over their heads.  California, bound by its private obligations to non-Native tobacco manufacturers, is using the MSA to force Tribal governments, Tribal leaders, and Tribal employees to comply with the State's MSA laws or face civil and criminal penalties. The effect has been chilling on Tribal economies and employees.

*THE MASTER SETTLEMENT AGREEMENT*

25.    Under the MSA, the Participating Manufacturers (manufacturers who agreed to the terms of the MSA, either initially or later, sometimes referred to herein as "PMs") agreed to pay the states hundreds of billions of dollars, which, while significant, is a fraction of the manufacturer's revenues.[1]  The payments are paid into an escrow fund until distributed to the settling states.[2]  Absent any disputes regarding payment adjustments, each settling state receives a pre-set allocable percentage of total MSA payments.  California's allocable share of 12.7639554% is the largest among all the settling states.

26.    While the MSA provides that its primary purpose is to decrease youth smoking and promote public health, and were impliedly intended to offset the health care costs incurred in the

---

[1]  Under the MSA the Participating Manufacturers made an initial up-front payment of approximately $12.75 billion in each of the first five years after execution of the MSA.  Annual payments beginning April 15, 2000 were approximately $4.5 billion.  The MSA provided that payments gradually increase each year until 2018.  Beginning in 2018 the Participating Manufacturers annual payment responsibility is set in perpetuity at $9 billion.

[2]  As will be discussed in subsequent paragraphs, the calculations to determine the annual payments are complex and payments are subject to a variety of potential offsets, including an inflation adjustment and a volume adjustment.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

settling states due to smoking, the MSA does not contain any provisions that require the states to allocate any of their individual settlement revenues to tobacco prevention or smoking cessation programs, or to actually off-set any health care costs the states incur as a result of smoking.

27.   In addition to requiring the Participating Manufacturers to make payments to the settling states, the MSA also imposed other limitations on other specific cigarette-manufacturer conduct.  These limitations include prohibitions and restrictions on tobacco-related advertising and prohibiting practices that seek to conceal negative information about smoking.

28.   The payments the MSA required the Participating Manufacturers to make, along with the MSA's prohibition on long-standing and proven-successful deceptive marketing practices, caused the Participating Manufacturers concern that the combined cost impacts of the MSA would threaten their dominance in the market and thereby threaten the massive profits they realized from the sale of cigarettes.  Therefore, Participating Manufacturers – the parties accused of rampant fraud and deceit – demanded protections against competition from both smaller cigarette manufacturers that had not been accused of wrongdoing and manufacturers that might enter the market after the execution of the MSA – neither of whom had any reason to become after-the-fact signatories to the agreement.

29.   One of the most important protections against competition afforded the Participating Manufacturers under the MSA is the Non-Participating Manufacturer ("NPM") Adjustment.   The NPM Adjustment provides that the payments by the Participating Manufacturers into the escrow fund can be reduced – in significant amounts – if it is determined that Participating Manufacturers have lost market share as a result of competition from Non-Participating Manufacturers.  The only way a state can avoid losing some or all of its allocable percentage of the MSA payments is if it has enacted and "diligently enforced" a "Qualifying Statute."   The "Qualifying Statute" is a statute that requires NPMs to deposit money into an escrow account based on the number of cigarettes the NPM sold in a state the prior year.  The amount of the escrow payment required is roughly equal to the per-cigarette-sold amount the PMs must pay to the states annually under the MSA.

COMPLAINT

FREDERICKS PEEBLES
& MORGAN LLP
2020 L St., Ste. 250,
SACRAMENTO, CA
95811

30.    The overriding purpose of the NPM Adjustment and one of the primary stated purposes of the escrow requirement imposed on Non-Participating Manufacturers is to guarantee PMs price parity with NPMs.

31.    California's MSA "Qualifying Statute" is the California Reserve Fund Statute ("Escrow Statute"), California Health and Safety Code sections 104555-104557.  The Escrow Statute requires NPMs selling cigarettes in the State either to join the MSA or to place funds in escrow at a specified rate for each cigarette sold in California during the previous year.  Cal. Health & Safety Code § 104557.  In addition, the Escrow Statute requires every NPM to "certify" to the Attorney General each year that it is in compliance with its escrow obligations.  The escrow payment for 2018 is estimated to be $6.95 per pack of cigarettes.

32.    Shortly after the settling states and the PMs executed the MSA, states (including California) began experiencing difficulties enforcing their "Qualifying Statutes."  Consequently, these states (including California) began experiencing reductions in MSA payments.  Under pressure from the Participating Manufacturers, and in an effort to shore up MSA payments, the states (including California) began enacting "contraband" statutes intended to ensure that NPMs made escrow payments.  The hook such states used in their "contraband" statutes, to ensure escrow compliance, was adding provisions that prohibited state stamping agents from placing state excise tax stamps on cigarettes sold by non-compliant NPMs.  In addition, the "contraband" statues prohibited the non-compliant NPMs from paying the state cigarette excise taxes and similarly prohibited state taxing agencies from accepting cigarette excise tax payments directly from non-compliant NPMs.

33.    California's "contraband" statute is found at California Tax and Revenue Code section 30165.1, and is commonly known as the California Complimentary Statute, or California Tobacco Directory Law ("Complimentary Statute").  The Complimentary Statute requires the California Attorney General to maintain and publish a list of tobacco product manufacturers and tobacco brand families that have been approved for sale in California.  Cal. Rev. & Tax. Code § 30165.1(c).  To be included on the list, a tobacco manufacturer must certify that it is either a Participating Manufacturer or it is an NPM that is in full compliance with the Escrow Statute

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

and in compliance with all of California's tobacco product, licensing, and manufacturing laws. Cal. Rev. & Tax. Code § 30165.1(b).

34.  The Complimentary Statute prohibits any person from selling, offering for sale, possessing for sale, shipping or otherwise distributing into California or within California, or importing for personal consumption in California, any cigarettes of a tobacco manufacturer or brand family that is not included in the Attorney General's tobacco directory.  Cal. Rev. & Tax. Code § 30165.1(e)(2).  The California Cigarette and Tobacco Products Tax Law generally defines the phrases "[i]n this State" and "in the State" to include "all territory within [the exterior boundaries of the State of California] owned by or ceded to the United States of America."  Cal. Rev. & Tax. Code § 30013.  Thus, the California Cigarette and Tobacco Products Tax Law purports to impose the prohibitory provisions of the Complimentary Statute on all persons and entities – even Indian tribal governments operating on federally-recognized Indian reservations.

35.  When enacting or amending its MSA-related laws, California has not only acted in concert with Big Tobacco, but has sought their input, advice, counseling, and approval of the specific language and reach of those MSA-related laws.

### *CALIFORNIA'S MSA-RELATED POLICY DECISIONS*

36.  Had California followed wise policy practices, the MSA and California's enactment of statutes related to the MSA could have been sound public health measures. However, due to a series of policy decisions inconsistent with California's ostensible goals in suing Big Tobacco and agreeing to the MSA, California's implementation and enforcement of the MSA appears to be more of a scheme to protect the market share and profits of Big Tobacco.

37.  Instead of dedicating the billions of dollars of MSA payments it received to anti-smoking programs, tobacco research, or reimbursement of health care costs associated with smoking, California elected to direct MSA payments into the State's general fund. Consequently, allocation of California's MSA funds has been largely controlled by the State's fiscal policy priorities.  Those priorities have rarely, if ever, included a serious dedication to anti-smoking, anti-tobacco, campaigns.  Instead, in many years the State's priorities concerning MSA funds has been to use those funds to address California's massive budget deficits.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

38.    In 2002, the State dedicated a mere $20 million of MSA funds to California's tobacco control program.  However, in nearly every year since, the State has cut tobacco control funding, and instead of using MSA funds for their purposes, the State embarked on a policy of securitizing California's future MSA payments.

39.    California first securitized its MSA funds through bond offerings in 2003 with two tobacco settlement revenue ("TSR") offerings. The first was the Asset-Backed Bond Series 2003A offering of $3,000,0000,000.  The second was the Enhanced Asset-Backed Bond Series 2003B offering of $2,572,285,000.  In 2005, California issued its third TSR bond offering with the Enhanced Asset-Backed Bonds Series 2005A with a principal amount of $3,140,563,508.  In 2007, California issued its fourth TSR bond offering with the Asset-Backed Bonds Series 2007 (Series B & C Capital Appreciation Bonds) with a principal amount of $4,446,826,381.  In 2013, California issued its fifth TSR bond offering with the Enhanced Asset-Backed Bonds Series 2013A with a principal amount of $375,105,000.  In 2017, California issued its sixth TSR bond offering with Asset-Backed Series 2017A-1 Bonds with a principal amount of $630,855,000. And in 2018, California continued its tapping into its further MSA funds with the Enhanced Asset-Backed Series 2018A Bonds with a principal amount of $110,540,000.

40.    The net effect of California's decision to securitize its future MSA funds is that currently, and into the foreseeable future, all of California's expected annual MSA funds are dedicated solely to debt service on its outstanding TSR bonds.

41.    Importantly, California's ability to make good on its bond obligations is primarily dependent upon a continuing stream of MSA payments.  To ensure the stream of MSA payments, California depends on the PMs continuing to sell massive amounts of cigarettes in California, and more importantly, the PMs maintaining their current market dominance.  If the PMs' sale of cigarettes diminishes below what California anticipated in association with the issuance of the TSR bonds, or if the MSA payments California receives are subjected to an NPM Adjustment, California is required either to default on its bond obligations (and destroy its credit rating), or to dip into General Fund reserves to make good on its payments.

42.    Consequences of California's commitment to securitizations have already

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

manifested.  In 2012, California's MSA payment was not sufficient to pay the interest on the Series 2005A bonds and the Series 2007 bonds.  Therefore, California had to tap General Fund reserve accounts to cover nearly $10 million of a combined interest obligation of roughly $156 million.

### THE NPM ADJUSTMENT ARBITRATION AND SUBSEQUENT SETTLEMENT

43.   The tenuousness of the situation in which California put itself by essentially mortgaging its future MSA payments, and its concomitant need to protect Big Tobacco from competition by compelling price parity for cigarettes and tobacco products (including through initiating attacks on Indian tribal governments and businesses engaged in the distribution and sale of cigarettes) is clearly illustrated by events beginning almost immediately after the settling states and the PMs executed the MSA.

44.   In 2003, the Participating Manufacturers incurred a market-share loss.  Therefore, the Participating Manufacturers withheld their MSA payments.

45.   An Independent Auditor found that for the year of 2003 the Participating Manufacturers incurred a market-share loss.

46.   A nationally-recognized firm of economic consultants determined that the competitive disadvantages arising from the MSA were a significant factor contributing to the lost market share.

47.   The Independent Auditor calculated the potential NPM Adjustment at $1.1 billion but declined to apply the NPM Adjustment because all of the settling states had Qualifying Statutes in effect in 2003 and there had been no finding as to whether any state had failed to "diligently enforce" its Qualifying Statute.

48.   The Participating Manufacturers objected to the decision not to apply the NPM Adjustment and alleged that no state had "diligently enforced" its Qualifying Statute in 2003.

49.   Participating Manufacturers initiated an arbitration proceeding ("Arbitration Proceeding") to reduce the amounts the Participating Manufacturers owed to the Settling States. Under the MSA, such amounts could be reduced by hundreds of millions of dollars if a settling state did not "diligently enforce" its Qualifying Statute.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

50.    The Arbitration Proceeding between California and Big Tobacco was resolved in March of 2013 with the execution of a memorandum of understanding (the "Arbitration Settlement") and accompanying term sheet (the "Term Sheet").  A copy of the Term Sheet is attached hereto as **Exhibit A**.

51.    The Term Sheet makes clear that the terms of the Arbitration Settlement negotiated between California and Big Tobacco included provisions applicable to Indian tribal governments and Tribal retailers.

52.    The Term Sheet includes provisions applicable to the sale of tobacco products by federally-recognized Indian tribal governments.  It excludes from the definition of non-compliant cigarettes, for example, those which the State is barred from requiring escrow deposits by order of a court that requiring such deposits is barred by federal or state constitutional law (*except* "state constitutional law as it may impact or be applied in relation to sovereign immunity or other Native American issues") or federal statutory or common law.  Term Sheet, Sec. III.B.2.c.

53.    The Term Sheet also contains provisions restricting the terms of any cigarette compacts between states and Indian tribal governments, placing limits on the amount of escrow funds that federally-recognized Indian tribes could receive pursuant to such compacts, and how compacting tribes may use such funds.  Term Sheet, Sec. III.B.2.d.

54.    The Term Sheet explicitly characterizes sales based on the race of the seller and purchaser. Certain sales made by Native Americans to other Native Americans are purportedly exempt from the states' diligent enforcement requirements.  Term Sheet, Sec. III.C.2 (fn 6).

55.    Neither Big Tobacco nor the State of California have made a copy of the Arbitration Settlement publicly available. The full content of its terms and the scope of its provisions remain unknown.  On the basis of publicly-available information from other states that participated in, or were parties to, the Arbitration Settlement, however, BSR Enterprises believes the facts alleged below concerning the Arbitration Settlement to be true.

56.    Based on information and belief, the effectiveness of the Arbitration Settlement is conditioned upon joinder in its terms by a "critical mass" of settling states, which has now occurred.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

57.   Based on information and belief, the Arbitration Settlement, like the MSA, incorporates model legislation that the State must either adopt (the "Model Legislation") or face substantial reductions of funds from Participating Manufacturers.   A Model Legislation provision will be deemed in full force and effect if enacted without modification or if functionally equivalent legislation is enacted instead.

58.   Based on information and belief, the Model Legislation includes mandatory provisions applicable only to Indian tribal governments within the geographic boundaries of the State, provisions that define "Indian tribe" as meaning any federally-recognized Indian tribe, band, nation, Alaska Native village or other organized group or community.

59.   Based on information and belief, the Model Legislation defines "person" as including any Indian tribe or instrumentality thereof or any member of an Indian tribe.

60.   Based on information and belief, the Model Legislation defines "qualified tribal lands" as any lands title to which is held by the United States for the benefit of an Indian tribe or individual or which is held by an Indian tribe or tribal member subject to restriction by the United States against alienation, and over which an Indian tribe exercises governmental power.

61.   Based on information and belief, the Model Legislation also includes mandatory provisions applicable only to Indian tribal governments and their citizens within Indian country (the "Tribal Provisions"). The Tribal Provisions include:

- Exemptions for cigarettes sold in Indian country by Indian tribal- or tribal member-owned business for official Indian tribal governmental use or to an adult enrolled member of the Indian tribe who lives on the Indian tribe's qualified lands;

- Limits on the quantity of cigarettes that may be sold in exempt transactions on a Indian tribe's qualified lands, such quantity to be determined by the number of enrolled adult members of the Indian tribe;

- Demands that tribes submit documentation to the State demonstrating the number of adult enrolled tribal members domiciled on the Indian tribe's qualified Indian tribal lands, which must then be verified by State officials;

- A ban on any future agreement, compact or treaty with any Indian tribe that is

COMPLAINT

Fredericks Peebles
& Morgan LLP
2020 L St., Ste. 250,
Sacramento, CA
95811

inconsistent with the Model Legislation.

62.   California enacted legislative provisions that are consistent with the purposes of the Arbitration Settlement and the Model Legislation.

63.   Based on information and belief, as part of the Arbitration Settlement California agreed that it has no compacts or treaties with Indian tribes or tribal entities or tribal members that are inconsistent with the Arbitration Settlement or the mandatory or tribal provisions of model legislation forming part of the Arbitration Settlement.

### *STATE CIGARETTE EXCISE TAXES*

64.   The State's Cigarette and Tobacco Products Tax Law, Cal. Rev. & Tax. Code §§ 30001-30483, imposes several taxes on cigarettes, in the total amount of $2.87 per pack of twenty cigarettes.  The Cigarette and Tobacco Products Tax Law also imposes taxes on non-cigarette "tobacco products."

65.   Section 30101 (initially enacted by the legislature in 1959) imposes a tax of 12 cents per pack.  It provides in part: "Every distributor shall pay a tax upon his or her distribution of cigarettes … at the rate of six mills ($0.006)…."

66.   Section 30123 (added by Proposition 99 in 1988) imposes a tax of 25 cents per pack.  Subdivision (a) of § 30123 provides:  "In addition to the tax imposed upon the distribution of cigarettes by this chapter, there shall be imposed upon every distributor a tax upon the distribution of cigarettes at the rate of twelve and one-half mills ($0.0125) for each cigarette distributed."  Section 30123 also imposes a tax on tobacco products, providing in subdivision (b):  "There shall be imposed upon every distributor a tax upon the distribution of tobacco products, based on the wholesale cost of these products, at a tax rate, as determined annually by the State Board of Equalization, which is equivalent to the combined rate of tax imposed on cigarettes by subdivision (a) and the other provisions of this part."

67.   Section 30131.2 (added by Proposition 10 in 1998) imposes a tax of 50 cents per pack.  Subdivision (a) of § 30131.2 provides in part:  "In addition to the taxes imposed upon the distribution of cigarettes … in this chapter, there shall be imposed an additional surtax upon every distributor of cigarettes at the rate of twenty-five mills ($0.025) for each cigarette

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

distributed."  Section 30131.2 also imposes a tax on tobacco products, providing in subdivision (b):  "In addition to the taxes imposed upon the distribution of tobacco products … in this chapter, there shall be imposed an additional tax upon every distributor of tobacco products, based on the wholesale cost of these products, at a tax rate, as determined annually by the State Board of Equalization, which is equivalent to the rate of tax imposed on cigarettes by subdivision (a)."

68.   Section 30130.51 (added by Proposition 56 in 2016) imposes a tax of two dollars per pack.  Subdivision (a) of § 30130.51 provides in part:  "In addition to any other taxes imposed upon the distribution of cigarettes under this part, there shall be imposed an additional tax upon every distributor of cigarettes at the rate of one hundred mills ($0.100) for each cigarette distributed…."  Subdivision (b) of § 30130.51 calls for the adoption of regulations to implement "an equivalent tax on electronic cigarettes" and associated nicotine substances.

69.   The following terms are defined in the Cigarette and Tobacco Products Tax Law:

- "'Distribution' includes:  (a) The sale of untaxed cigarettes or tobacco products in this state.  (b) The use or consumption of untaxed cigarettes or tobacco products in this state.  (c) The placing in this state of untaxed cigarettes or tobacco products in a vending machine or in retail stock for the purpose of selling the cigarettes or tobacco products to consumers."  § 30008.

- "'Sale' includes any transfer of title or possession for a consideration, exchange or barter, in any manner or by any means whatever."  § 30006.

- "'Use or consumption' includes the exercise of any right or power over cigarettes or tobacco products incident to the ownership thereof, other than the sale of the cigarettes or tobacco products or the keeping or retention thereof by a licensed distributor for the purpose of sale."  § 30009.

- "'In this State' or 'in the State' means within the exterior limits of the State of California and includes all territory within these limits owned by or ceded to the United States of America."  § 30013.

70.   Where the distributor is untaxable, the legal incidence of the State cigarette taxes

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

falls on the consuming purchasers, and a collection and remittance requirement is imposed on the untaxable distributor. *California State Board of Equalization v. Chemehuevi Indian Tribe*, 474 U.S. 9, 11-12 (1985); *see* Cal. Rev. & Tax. Code §§ 30107 (taxes resulting from the use or consumption of untaxed cigarettes or tobacco products shall be paid by the user or consumer); 30108(a) (when taxes imposed under the Cigarette and Tobacco Products Tax Law are "inapplicable" to distributor's "sale" of cigarettes and tobacco products, distributor shall collect the tax from the purchaser); *see also* Cal. Rev. & Tax. Code §§ 30183 (distributor required under § 30108 to collect tax shall file report); 30184 (distributor shall remit payment of tax with report); 30187 (consumer subject to tax resulting from use or consumption, from whom the tax has not been collected under § 30108, shall pay tax directly to the State); 18 Cal. Code Regs. § 4091.

71.     The Cigarette and Tobacco Products Tax Law does not require an untaxable distributor to pre-collect taxes in anticipation of a future taxable event, but instead requires collection to occur "at the time of making the sale or accepting the order or, if the purchaser is not then obligated to pay the tax with respect to his or her distribution of the cigarettes or tobacco products, at the time the purchaser becomes so obligated[.]" Cal. Rev. & Tax. Code § 30108(a).

72.     Where both the distributor and retailer are untaxable, the Cigarette and Tobacco Products Tax Law does not require the distributor to collect any cigarette and tobacco product taxes from taxable consumers and remit such taxes to the State. *See* Cal. Dept. of Tax and Fee Admin., Publication 146 at 23 (Oct. 2017).

### *FEDERAL PACT ACT AND CCTA*

73.     The federal PACT Act imposes certain reporting and other obligations on sellers of cigarettes and other tobacco products. Pub. L. 111-154 (Mar. 31, 2010), 124 Stat. 1087, codified at 15 U.S.C. §§ 375-378 and § 375 note, and 18 U.S.C. §§ 1716E and 2343(c).

74.     The federal Contraband Cigarette Trafficking Act ("CCTA") provides, among other things, that it is a crime, punishable by fine, imprisonment, or both, "knowingly to ship, transport, receive, possess, sell, distribute, or purchase" large quantities of cigarettes "which bear no evidence of the payment of applicable State or local cigarette taxes[.]" 18 U.S.C. §§ 2341-2346.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

*FEDERAL INDIAN TRADER STATUTES*

75.   The Indian Trader Statutes, 25 U.S.C. § 261-264, preemptively govern on-reservation trade with Indians.  Section 261, enacted in 1876, states: "The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261.  Section 262, enacted in 1901 (amended in 1903), states: "Any person desiring to trade with the Indians on any Indian reservation shall, upon establishing the fact, to the satisfaction of the Commissioner of Indian Affairs, that he is a proper person to engage in such trade, be permitted to do so under such rules and regulations as the Commissioner of Indian Affairs may prescribe for the protection of said Indians." 25 U.S.C. § 262.  Section 263, enacted in 1834, states in part: "The President is authorized, whenever in his opinion the public interest may require the same, to prohibit the introduction of goods, or of any particular article, into the country belonging to any Indian tribe[.]" 25 U.S.C. § 263.

76.   Federal regulations implementing the Indian Trader Statutes regulate the sale of cigarettes and tobacco products as follows:  "No trader shall sell tobacco, cigars, or cigarettes to any Indian under 18 years of age."  25 C.F.R. § 140.17.

77.   The U.S. Supreme Court has held that the Indian Trader Statutes are "in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." *Warren Trading Post v. Ariz. State Tax Comm'n*, 380 U.S. 685, 690 (1965); *Central Machinery Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 166 (1980).

78.   The U.S. Supreme Court has held that the Indian Trader Statutes preempt state laws, including cigarette tax and regulatory laws, that seek to "dictate 'the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.'" *Dept. of Taxation and Finance v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 75 (1994) (quoting 25 U.S.C. § 261).

*BIG SANDY RANCHERIA ENTERPRISES*

79.   BSR Enterprises is a federally-chartered corporation incorporated and operating

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

under section 17 of the Indian Reorganization Act of June 18, 1934, c. 576, § 17, 48 Stat. 984, 25 U.S.C. § 5124 (formerly 25 U.S.C. § 477) ("IRA").

80.   BSR Enterprises is wholly owned by the Big Sandy Rancheria.

81.   BSR Enterprises is authorized and empowered to engage in and conduct any lawful activity or business in which a federally-chartered corporation may engage in, including the creation of subdivisions and subsidiary corporations.

82.   BSR Enterprises was formed for the purposes of advancing the economic opportunities and the prosperity of the Big Sandy Rancheria and its members through the conduct of lawful business activity.

### *BSR DISTRIBUTING, IRA*

83.   Big Sandy Rancheria passed Ordinance No. 0310-01 in March of 2010 for the purposes of regulating the sales of tobacco products within the jurisdiction of the Tribe and establishing Tribal enterprises to engage in the sale of tobacco products ("Tobacco Ordinance").

84.   The Tobacco Ordinance authorizes the Tribe to manufacture tobacco products, acquire tobacco products from native manufacturers and wholesalers operating in Indian Country, and to distribute retail tobacco products to individuals or other entities on the Rancheria or in Indian country.

85.   The Tribe created BSR Distributing, IRA ("BSR Distributing") to serve resellers and consumers of cigarettes and tobacco products in Indian country.  The Tribe's tobacco distribution enterprise formerly did business under the name "BSR Distribution."

86.   Before the creation of BSR Distributing, the Big Sandy Rancheria was an economically depressed area experiencing chronic and severe unemployment. The Tribe created BSR Distributing to foster economic development on the Rancheria and to create economic opportunities for Tribal members.

87.   BSR Distributing is a subdivision of Big Sandy Rancheria Enterprises.

88.   The registered office and principal place of business of BSR Distributing is within the exterior boundaries of the Big Sandy Rancheria on lands held in trust by the United States for the benefit of the Big Sandy Rancheria of Western Mono Indians.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

89.    BSR Distributing is organized to engage in the distribution of tobacco products for the purposes of advancing the economic opportunities and prosperity of the Big Sandy Rancheria Band of Western Mono Indians and its members.

90.    BSR Distributing purchases exclusively from Indian tribal manufacturers within Indian Country.  The goods purchased by BSR Distributing are received at its warehouse facilities on the Tribe's reservation in Auberry, California. BSR Distributing resells and distributes those goods to Indian tribal governmental and tribal-member reservation-based wholesalers and retailers exclusively in Indian Country.

91.    BSR Distributing's business model is predicated on the lawful trade between federally recognized Indian tribal governments in Native goods manufactured within Indian Country and the general exemption of such trade from impermissible state regulation.

92.    BSR Distributing has succeeded in improving the social and economic well-being of the Tribe's members as well as surrounding localities.  BSR Distributing has created dozens of jobs for Tribal members.  All revenues earned by BSR Distributing belong to the Tribe.  The Tribe appropriates the revenues from BSR Distributing to the Tribe's general fund to support Tribal social welfare programs.

### *BIG SANDY IMPORTING, IRA*

93.    Big Sandy Importing, IRA ("Big Sandy Importing") is a subdivision of Big Sandy Rancheria Enterprises.

94.    The registered office and principal place of business of Big Sandy Importing is within the exterior boundaries of the Big Sandy Rancheria on lands held in trust by the United States of America for the benefit of the Big Sandy Rancheria.

95.    Big Sandy Importing is organized to engage in the importation of tobacco and tobacco products onto the Big Sandy Rancheria for the purposes of advancing the economic opportunities and prosperity of the Tribe and its members through the conduct of lawful business activities.

96.    Big Sandy Importing obtained a Tobacco Importer permit pursuant to 26 USC Chapter 52, Number CA-TI-30025, effective November 8, 2017 and expiring on November 7,

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

2022, issued by the Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau.

*CALIFORNIA'S THREATS AGAINST BIG SANDY*

97.    By letters dated February 2, 2011 and March 22, 2011, the AG mailed to BSR Distribution the State's interpretation of how the PACT Act and the law it amended, the Jenkins Act, applied to BSR Distribution.  A copy of February 2, 2011 letter is attached as **Exhibit B**. A copy of the March 22, 2011 letter is attached hereto as **Exhibit C**.

98.    The AG's March 22, 2011 letter stated that under the PACT Act's definition of "interstate commerce," tribal businesses like BSR Distribution that sold and shipped cigarettes between reservations in California were required under federal law to make certain filings with federal and state governments.  *Id.*  The letter further stated that Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") had made "clear" its support for the AG's position.  *Id.*  It added that knowing violations of the Jenkins Act may be punishable by criminal and civil penalties, including imprisonment.  *Id.*  The letter concluded by providing the contact information for the state official with whom BSR Distribution should register.  *Id.*

99.    Big Sandy Rancheria Chairwoman Elizabeth Kipp, on behalf of the Tribe, responded by letter dated April 30, 2011.  A copy of her April 30, 2011 letter is attached hereto as **Exhibit D**.

100.  Chairwoman Kipp set forth the Tribe's view of the PACT Act's application to the intertribal commercial activities.  *Id.*  Those views hinged on the plain language of the PACT Act, including those sections not referenced either by the AG or by ATF in their earlier interpretation.  *Id.* at 2.  *See*, *e.g.*, Pub. L. 111-154, § 5.

101.  Under Section 5 of the PACT Act, Congress expressly preserved the respective jurisdictional limits of tribes and states.  *Id.* at 1.  Chairwoman Kipp further noted that ATF's interpretation of "interstate commerce," relied on by the State, ran counter to the Act's own language.  *Id.* at 2.

102.   Unbeknownst to Chairwoman Kipp, however, the California AG had already filed suit in federal court against her on April 25, 2012.  *See California v. Kipp*, No. 12-CV-0659-LJO-SKO (E.D. Cal., Complaint filed Apr. 25, 2012) (hereafter "*California v. Kipp*").  A copy

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

of the State's complaint is attached hereto as **Exhibit E**.

103.  The State's suit sought injunctive relief to compel Chairwoman Kipp:  (i) to ensure that BSR Distributing complied with 15 U.S.C. § 376(a); and (ii) to disclose any and all information needed to monitor BSR Distributing's compliance with any injunction.  *California v. Kipp* Complaint p. 6.

104.  The State never served Chairwoman Kipp with a summons in the suit.  Unaware of the action, Chairwoman Kipp had agreed to participate in discussions with the State and the leaders of other federally recognized tribes to resolve issues relating to the sale and taxation of cigarettes and tobacco products on Indian reservations in the state.  *California v. Kipp*, ECF 10 at ¶ 3.

105.  The California Attorney General subsequently filed notice of voluntary dismissal of *California v. Kipp* on September 12, 2012, and the Court then ordered the action dismissed.  *California v. Kipp*, ECF 12, 14.

106.  Based on information and belief, the AG surmised that it could achieve its goals of ending the Tribe's successful intertribal commercial activities through a Tribal-State tobacco compact.  *See* the October 15, 2012 letter from Chairwoman Kipp to the Deputy Attorney General, attached as **Exhibit F**.

107. The Tribe's discussions with the State focused on achieving a tobacco compact governing the retail sale of tobacco products on-reservation.  Since BSR Distributing is primarily a distributor of on-reservation, native-manufactured tobacco products to tribes and tribal businesses and not a tobacco retailer, the discussions did not address the issues BSR Distributing faces.

108.  Big Sandy Rancheria communicated its concerns about the inadequacy of the discussions to the State Attorney General and requested separate discussions.

109.  The Tribe's efforts to discuss relevant issues with the State in the ensuing year were unfruitful.

110.  The California Department of Justice again demanded that Big Sandy comply with provisions of California's MSA-related laws.  See the August 1, 2013 letter from the California

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

Department of Justice dated August 1, 2013 attached as **Exhibit G**.

111. In the August 1, 2013 letter, the California Attorney General also accused Chairwoman Kipp of continuing to be "in flagrant and continuing violation" of the PACT Act and threatened to re-file its lawsuit.  The State insisted on BSR Distributing's compliance "as a showing of good faith and of genuine interest in resolving the ongoing disputes between Big Sandy and the State." *Id.* at 2.

112. The State's August 1, 2013 letter made clear that the State would not negotiate unless and until BSR Distributing complied with the *State*'s vision of what tribal obligations under state and federal law should be.

113. Chairwoman Kipp responded by letter dated September 6, 2013, in which she reviewed the State's hostile and intransigent attitude displayed toward the Tribe.  A copy of Chairwoman Kipp's September 6, 2013 letter is attached hereto as **Exhibit H**.

114. The letter recounts that, among other things, State officials: (1) refused to engage in meaningful government-to-government consultations; (2) withheld notice from Chairwoman Kipp of other negotiating sessions concerning tribal tobacco; (3) excluded Big Sandy Rancheria from discussions with the leaders of other tribes concerning the terms of a compact; (4) refused to share the State's comments on proposed drafts of a compact with Big Sandy Rancheria; (5) dismissed the principle of tribal sovereignty; and (6) included attorneys at what few meetings occurred who have threatened litigation against Chairwoman Kipp and Big Sandy Rancheria.

115. A stumbling block to Big Sandy's discussions with the State was California's refusal to disclose the terms of the 2013 Arbitration Settlement.

116. Chairwoman Kipp informed the State in her September 6, 2013 letter that the terms of a tobacco compact could not be negotiated without knowing whether and how the terms of the Arbitration Settlement might affect it.

117. Despite having withdrawn its earlier suit, and notwithstanding its failure to engage the Tribe in serious government-to-government discussions, the California Attorney General once again turned to threats of civil and criminal penalties against the Tribe, Big Sandy Importing, and BSR Distributing.

Fredericks Peebles
& Morgan LLP
2020 L St., Ste. 250,
Sacramento, CA
95811

118.  The California Department of Justice again demanded that Big Sandy comply with the State's MSA Laws.  See the September 17, 2013 letter attached as **Exhibit I**.

119.  The State accused BSR Distributing of violating a slew of state regulations, from being unlicensed to distributing "off-directory" cigarettes, to failing to comply with state fire-safety regulations, to evading state cigarette taxes.  *Id.*  The State asserted that BSR Distributing's "[c]ontinued non-compliance with its obligations under state and federal law" could subject it to enforcement action.  *Id.*

120.  The State added: "You are undoubtedly aware of recent enforcement developments on the federal side involving PACT Act enforcement against some tribally affiliated tobacco business in Nebraska."  *Id.*  That was a reference to unlawful enforcement actions taken by ATF against the Winnebago Tribe of Nebraska, actions that Nebraska tribe challenged in federal court and that ATF and the Department of Justice settled within one week.  *See Ho-Chunk, Inc., et al. v. Holder*, No. 13-CV-1423 (D.D.C., complaint filed Sept. 19, 2013).

121.  On or about July 1, 2016, the California Attorney General directed correspondence to the Tribe regarding Big Sandy Distribution's sale of cigarettes.  A copy of the July 1, 2016 letter is attached as **Exhibit J**.  In the letter the State restated many of its prior claims that Big Sandy Distribution was violating a number of California laws, including selling cigarettes that are not listed on the California Tobacco Directory to tribal retailers.  In addition, the State's letters asserted that pursuant to California's Revenue and Taxation Code and the California Business and Professions Code, Big Sandy Distribution was required obtain distributor's licenses from the California Board of Equalization.  Relatedly, the State's letter asserted that Big Sandy Distributing was required to collect and remit state cigarette excise taxes and implied that Big Sandy Distributing was required to obtain a state permit to transport cigarettes to tribal retailers.  See July 1, 2016 letter at 2-3.

122.  The State's July, 1, 2016, letter concluded with the warning: "BSRD must take … substantial, affirmative steps to cure its violations of applicable state law.  Failure to do so places BSRD at continued risk of prosecution under applicable state and federal laws."  See the July 1, 2016, letter at 3-4.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

123. On or about July 12, 2016, the State again directed correspondence to the Tribe regarding Big Sandy Distributing. A copy of the July 12, 2016 letter is attached as **Exhibit K**. In the July 12, 2016, letter the State asserts that Big Sandy Distributing is violating the PACT Act and asserts that Big Sandy Distributing and its tribal retail customers are not "lawfully operating" for a myriad of reasons including: (1) they sell cigarettes that are not listed on California's Tobacco Directory; (2) the Indian manufactures of the cigarettes Big Sandy Distributing sells are not licensed by the State in accordance with the California Cigarette and Tobacco Products Licensing Act of 2003; (c) Big Sandy Distributing does not have a California Importer's Permit, or State issued Distributor's Permit; (d) Big Sandy Distributing has not collected and remitted California cigarette excise taxes on the sales it makes to tax-exempt entities; and that Big Sandy Distributing does not have a State issued permit to transport untaxed cigarettes.

124. On or about May 21, 2018, through written correspondence, the California Attorney General demanded that Black Star Transportation Group, LLC provide the California Attorney General's Office with records relating specifically to Big Sandy Distributing and Big Sandy's shipment of cigarettes. The May 21, 2018, correspondence alleges that Big Sandy Distributing is "unlicensed" and implies that Big Sandy Distributing is acting in violation of California law by failing to obtain a California Cigarette and Tobacco Distributor's license and by distributing cigarettes that do not bear a California tax stamp. A copy of the May 21, 2018, letter is attached as **Exhibit L**.

125. The State's actions here complained of effectively seek to force tribes in Indian country to comply with the MSA and California's implementation thereof. California's purpose in demanding tribal compliance is to protect Big Tobacco and maintain Big Tobacco's sales volumes and market share through compelled price parity.

## FIRST CAUSE OF ACTION
**(Federal common law and Tribal sovereignty preempt the application of the State's Complementary Statute against BSR Enterprises)**

126. Plaintiff incorporates by reference and realleges herein the allegations contained in

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

the foregoing paragraphs of this Complaint.

127.  The federal government generally possesses authority over Indian affairs.  *See*, *e.g.*, *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 172 fn.7 (1973) (identifying the "source of federal authority over Indian matters" as deriving "from the federal responsibility for regulating commerce with Indian tribes and for treaty making"); *Williams v. Lee*, 358 U.S. 217, 219 n.4 (1959) (stating the "Federal Government's power over Indians is derived from" the Indian Commerce Clause "and from the necessity of giving uniform protection to a dependent people").

128.  The principle of Indian tribal self-government informs federal enactments and federal Indian policy, and provides another sufficient basis, independent of federal preemption, for a state law's inapplicability to activity undertaken in Indian country.

129.  The State lacks civil regulatory jurisdiction over Indians' commerce with Indians within Indian country except with express congressional approval, or for the purpose of imposing minimal burdens reasonably tailored to the collection of valid State taxes from non-Indians.  *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987); *Dept. of Taxation and Finance v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 73 (2005).

130.  Congress has not authorized or approved the State's MSA Laws, including its Complementary Statute.

131.  The State's MSA Laws, including its Complementary Statute, do not assist enforcement or collection of valid State taxes imposed upon non-Indians.

132.  Under federal common law and in accordance with principles of Indian tribal self-governance, the State does not possess authority to apply its Complementary Statute to BSR Enterprises.

### SECOND CAUSE OF ACTION
### (The Indian Trader Statutes preempt the application of the State's Complementary Statute against BSR Enterprises)

133.  Plaintiff incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

134.  The Indian Trader Statutes, 25 U.S.C. §§ 261-264, delegate to the federal executive

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

branch the sole power and authority to regulate trade with Indians.

135.  The State's Complementary Statute imposes burdens upon BSR Enterprises in addition to federal and tribal regulatory burdens, and specifies the "kind" of goods that may be sold to Indians, by limiting the cigarettes that BSR Enterprises may sell (or offer, possess for sale, ship, or distribute) to cigarettes of a tobacco product manufacturer or brand family included in the directory list prepared by the State's Attorney General pursuant to subdivision (c) of the Directory Law.  Cal. Health & Safety Code § 30165.1(e)(2).

136.  The application of the State's Complementary Statute to BSR Enterprises interferes and is incompatible with the federal regulation of trade with Indians within Indian country.

137.  The Indian Trader Statutes preempt the application of the State's Complementary Statute to BSR Enterprises.

**THIRD CAUSE OF ACTION**
**(Federal common law and Tribal sovereignty preempt application of the State's licensing requirements to BSR Enterprises)**

138.  Plaintiff incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

139.  The State's Cigarette and Tobacco Products Licensing Act, Cal. Bus. & Prof. Code §§ 22970-22991, requires manufacturers, importers, distributors, wholesalers and retailers of cigarettes and tobacco products to hold State-issued licenses, requires licensees to comply with a variety of requirements, and generally prohibits the sale of cigarettes and tobacco products to, or the purchase of cigarettes and tobacco products from, such businesses that are unlicensed.

140.  On its face, the Cigarette and Tobacco Products Licensing Act would apply to BSR Enterprises as a distributor and as an importer.

141.  The Cigarette and Tobacco Products Licensing Act states:  "No person is subject to the requirements of this division [i.e., the Cigarette and Tobacco Products Licensing Act] if that person is exempt from regulation under the United States Constitution, the laws of the United States, or the California Constitution."  Cal. Bus. & Prof. Code § 22971.4.

142.  The State's Cigarette and Tobacco Products Tax Law, Cal. Rev. & Tax. Code §§

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

30001-30483, requires distributors and wholesalers of cigarettes and tobacco products to hold State-issued licenses, in addition to licenses required under the Cigarette and Tobacco Products Licensing Act, and imposes associated obligations and restrictions upon licensees. *See* Cal. Rev. & Tax. Code §§ 30140-30159.

143.   On its face, the licensing requirements of the Cigarette and Tobacco Products Tax Law would apply to BSR Enterprises as a distributor.

144.   The State Board of Equalization sent a letter to BSR Distribution in 2008, which stated in part:  "Is the Rancheria owned by Native Americans?  If so, technically not required to apply for CA Distributor's license due to that the fact that you are under a [sovereign] nation.  Unless, you plan to sell to CA retailers and wholesalers then a distributor's license is required."  Letter from K. Su, Board of Equalization, to R. Johnson, Big Sandy Distribution, Apr. 30, 2008.  A copy of the April 30, 2008 letter is attached as **Exhibit M**.

145.   BSR Enterprises does not hold a license under the Cigarette and Tobacco Products Licensing Act or the Cigarette and Tobacco Products Tax Law.

146.   The State recently notified a transporter of cigarettes for BSR Enterprises that its transportation of cigarettes for an unlicensed person is a violation of law.  See letter to Black Star Transportation Group, LLC, May 21, 2018 (Exhibit L).

147.   Congress has not authorized or approved the State's Cigarette and Tobacco Products Licensing Act or the licensing requirements of the Cigarette and Tobacco Products Tax Law.

148.   The licensing requirements of the State's Cigarette and Tobacco Products Licensing Act and Cigarette and Tobacco Products Tax Law, as applied to BSR Enterprises, do not assist enforcement or collection of valid State taxes imposed upon non-Indians.

149.   Under federal common law and in accordance with principles of Indian tribal self-governance, the State does not possess authority to apply its licensing requirements to BSR Enterprises.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250,
SACRAMENTO, CA
95811

**FOURTH CAUSE OF ACTION**
**(The Indian Trader Statutes preempt application of the State's licensing requirements to BSR Enterprises)**

150.  Plaintiff incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

151.  The Cigarette and Tobacco Products Licensing Act and the licensing requirements of the Cigarette and Tobacco Products Tax Law impose regulatory and licensing burdens upon BSR Enterprises, in addition to any federal and tribal burdens, for BSR Enterprises' on-reservation trade with Indians.

152.  The application of the Cigarette and Tobacco Products Licensing Act and the licensing requirements of the Cigarette and Tobacco Products Tax Law to BSR Enterprises interferes and is incompatible with the federal regulation of trade with Indians in Indian country.

153.  The Indian Trader Statutes preempt the application of the State's licensing requirements to BSR Enterprises.

**FIFTH CAUSE OF ACTION**
**(Federal law and Tribal sovereignty preempt application of the State's Cigarette and Tobacco Products Tax Law against BSR Enterprises)**

154.  Plaintiff incorporates by reference and realleges herein the allegations contained in the foregoing paragraphs of this Complaint.

155.  Under federal law, the State cannot impose State taxes upon BSR Enterprises for its activities within Indian country, in the absence of congressional authorization.  *See Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101-02 (2005); *Oklahoma Tax Comm'n v. Chickasaw Nation*, 515 U.S. 450, 458 (1995).

156.  In addition, the Indian Trader Statutes preempt the State's imposition of tax directly upon BSR Enterprises for its on-reservation sales to Indians.  25 U.S.C. §§ 261-264; *Dept. of Taxation and Finance v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 74 (1994) (citing *Central Machinery Co. v. Ariz. State Tax Comm'n*, 448 U.S. 160, 164 (1980); *Warren Trading Post v. Ariz. State Tax Comm'n*, 380 U.S. 685, 691 (1965)).

COMPLAINT

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

157.  BSR Enterprises does not sell cigarettes or tobacco products to any purchasers other than retailers who are Indian entities located in Indian country.

158.  The retailers to whom BSR Enterprises sells cigarettes and tobacco products are not subject to the State taxes imposed under the Cigarette and Tobacco Products Tax Law, because such retailers are Indian entities located in Indian country.

159.  Because neither BSR Enterprises nor the persons to whom it sells cigarettes and tobacco products are subject to the State taxes imposed under the Cigarette and Tobacco Products Tax Law, BSR Enterprises is neither required to pay such taxes, nor required to collect such taxes from its customers.

160.  To the extent taxable consumers purchase taxable cigarettes and tobacco products from retailers who purchase such cigarettes and tobacco products from BSR Enterprises, it is the consumers' obligation to pay the tax, and the retailers' obligation to collect the tax from the consumers and remit it to the State.

161.  BSR Enterprises therefore seeks a judicial declaration that BSR Enterprises has no liability for the taxes imposed under the Cigarette and Tobacco Products Tax Law for the cigarettes and tobacco products it distributes.

### **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff requests that judgment be entered in its favor and against Defendants as follows:

1.     Declaring that the application of the State's Directory Law, Cigarette and Tobacco Products Licensing Act, and Cigarette and Tobacco Products Tax Law against the Plaintiff is preempted by federal law;

2.     Preliminarily and permanently enjoining Defendants, their agents, employees, successors, and all persons acting in concert or participating with them from enforcing, applying or implementing such laws against Plaintiff;

3.     Awarding costs, fees and expenses to Plaintiff; and

4.     Granting such other and further relief as the Court may deem just and proper.

FREDERICKS PEEBLES
& MORGAN LLP
2020 L ST., STE. 250.
SACRAMENTO, CA
95811

1

2     Respectfully submitted this 13th day of July, 2018,

3                                 John M. Peebles

4                                 Steven J. Bloxham
                                Michael A. Robinson

5                                 Tim Hennessy
                                FREDERICKS PEEBLES & MORGAN LLP

6                                 2020 L Street, Suite 250
                                Sacramento, California 95811

7                                 Telephone:  (916) 441-2700
                                Fax:  (916) 441-2067

8                                 Email:  jpeebles@ndnlaw.com

9

10                             By:*/s/ John M. Peebles*

11                                 John M. Peebles
                                Attorneys for Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

FREDERICKS PEEBLES
& MORGAN LLP
2020 L St., Ste. 250.
Sacramento, CA
95811