1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   BIG SANDY RANCHERIA                    No. 1:18-cv-00958-DAD-EPG
     ENTERPRISES, a federally chartered
12   corporation,

13                 Plaintiff,               ORDER GRANTING DEFENDANTS'
                                            MOTIONS TO DISMISS
14        v.
                                            (Doc. Nos. 15, 16)
15   XAVIER BECERRA, in his official
     capacity as Attorney General of the State of
16   California; and NICOLAS MADUROS, in
     his official capacity as Director of the
17   California Department of Tax and Fee
     Administration,
18
                   Defendants.
19

20        Plaintiff Big Sandy Rancheria Enterprises ("BSRE") brings this action challenging the

21   application of California's cigarette tax and licensing statutes.  On April 16, 2019, the matter

22   came before the court for a hearing on the motion to dismiss filed by defendant Xavier Becerra, in

23   his official capacity as Attorney General for the State of California ("Attorney General"), and the

24   motion to dismiss for lack of jurisdiction filed by defendant Nicolas Maduros, in his official

25   capacity as Director of the California Department of Tax and Fee Administration ("CDTFA").

26   (Doc. Nos. 15, 16.)  Attorneys John Peebles and Michael Robinson appeared on behalf of

27   plaintiff.  Attorneys James Hart and Peter Nascenzi appeared on behalf of the Attorney General

28   and attorney Michael von Loewenfeldt appeared on behalf of CDTFA.  Having considered the

                                                  1

parties' briefs and the arguments of counsel, and for the reasons set forth below, the court will grant defendants' motions.

# BACKGROUND

## A.    California's Cigarette Tax and Licensing Scheme

The first amended complaint alleges as follows. Since 1959, California has imposed excise taxes on the distribution of cigarettes. (Doc. No. 13 ("FAC") at ¶ 69.) The State's Cigarette and Tobacco Products Tax Law ("Cigarette Tax Law"), California Revenue & Taxation Code §§ 30001–30483, imposes several taxes on cigarettes, currently totaling $2.87 per pack of twenty cigarettes. (*Id.* at ¶ 68.) Generally, the State cigarette taxes are paid by distributors through stamps or meter impressions that are affixed to each pack of cigarettes at or near the time of sale. (*Id.* at ¶ 74) (citing Cal. Rev. & Tax. Code § 30163). Only cigarettes listed in the State's tobacco directory are permitted to bear such tax stamps. (*Id.*) (citing Cal. Rev. & Tax. Code § 30165.1(e)(1)).

When the distributor is not subject to the State's taxes, the tax is "paid by the user or consumer," and is collected by a distributor "at the time of making the sale or accepting the order." (*Id.* at ¶¶ 75–76) (quoting Cal. Rev. & Tax. Code §§ 30107, 30108(a)). Plaintiff BSRE contends in this action that when both the wholesale distributor and retail distributor are untaxable, California law does not require the wholesale distributor to collect and remit any taxes to the State. (*Id.* at ¶ 77.)

To facilitate the collection of these taxes, the State requires every distributor to hold two licenses. The Cigarette and Tobacco Products Licensing Act ("Licensing Act"), California Business & Professions Code §§ 22970–22991, requires manufacturers, importers, distributors, wholesalers, and retailers to obtain State-issued licenses, requires licensees to comply with various requirements, and generally prohibits the sale of cigarettes and tobacco products to, or the purchase of cigarettes and tobacco products from, such businesses that are unlicensed. (*Id.* at ¶ 78.) The Cigarette Tax Law also requires distributors and wholesalers of cigarettes and tobacco products to hold State-issued licenses, in addition to the licenses required under the Licensing Act, and imposes associated obligations and restrictions upon licensees. (*Id.* at ¶ 81) (citing Cal.

Rev. & Tax. Code §§ 30140–30159). Among those obligations is the requirement that distributors file monthly reports with the California Department of Tax and Fee Administration identifying both taxable and exempt distributions. (Doc. No. 15-1 at 14; Doc. No. 20 at 11.)

**B.      Tobacco Master Settlement Agreement**

In addition to the consumer-paid taxes collected on the distribution of cigarettes, the State also receives compensation from cigarette manufacturers pursuant to the 1998 Tobacco Master Settlement Agreement ("MSA"). (*Id.* at ¶ 29.) The MSA was the result of lawsuits brought by 46 states against major cigarette manufacturers to recover healthcare costs that the states claimed they had incurred as a direct result of smoking, and to challenge industry tactics such as targeting minors and covering up the known health impacts of smoking. (*Id.* at ¶¶ 22–29.)

Under the MSA, settling states receive annual payments from participating manufacturers in perpetuity. (*Id.* at ¶ 33.) Other cigarette manufacturers that are not signatories to the MSA are known as non-participating manufacturers. Participating manufacturers to the MSA negotiated protections against competition from non-participating manufacturers, including, most notably, the Non-Participating Manufacturer Adjustment. (*Id.* at ¶¶ 36–37.) The Non-Participating Manufacturer Adjustment provides that if participating manufacturers lose market share within a state as a result of competition from non-participating manufacturers, the administrative body created under the MSA can significantly decrease payments to that state. (*Id.* at ¶ 37.) The only way a state may avoid losing some or all of its MSA payments is if it has enacted and diligently enforced a "qualifying statute," which requires non-participating manufacturers to deposit money into an escrow account based on the number of cigarettes the non-participating manufacturers sold in the state the prior year. (*Id.*)

California's qualifying statute is the California Reserve Fund Statute ("Escrow Statute"), which requires non-participating manufacturers to either join the MSA or to place funds in escrow at a specified rate for each cigarette sold in California during the previous year. (*Id.* at ¶ 39) (citing Cal. Health & Safety Code § 104557(a)). The amount of the escrow payment required is roughly equal to the per-cigarette-sold amount that participating manufacturers must pay to the states annually under the MSA. (*Id.* at ¶ 37.) In this way, non-participating

3

manufacturers have roughly equivalent obligations to pay under the MSA, preventing non-participating manufacturers from receiving a competitive advantage over participating manufacturers.  (*Id.* at ¶ 38.)

To ensure that non-participating manufacturers comply with their obligations to make escrow payments, California enacted the California Complementary Statute ("Complementary Statute"), also known as the Directory Statute.  (*Id.* at ¶ 41) (citing Cal. Rev. and Tax. Code § 30165.1).  The Complementary Statute requires the California Attorney General to maintain and publish a list ("Tobacco Directory") of tobacco product manufacturers and tobacco brand families that have been approved for sale in California.  (*Id.*)  To be included in the Tobacco Directory, a tobacco manufacturer must certify that it is either a participating manufacturer, or that it is a non-participating manufacturer that is in full compliance with the Escrow Statute and all of California's tobacco product, licensing, and manufacturing laws.  (*Id.*) (citing Cal. Rev. and Tax. Code § 30165.1(b)).  The Complementary Statute prohibits any person from selling, offering for sale, possessing for sale, shipping, or otherwise distributing into California or within California, or importing for personal consumption in California, any cigarettes of a tobacco manufacturer or brand family that is not included in the Tobacco Directory.  (*Id.* at ¶ 42) (citing Cal. Rev. and Tax. Code § 30165.1(e)(2)).

**C.    Big Sandy Rancheria Enterprises**

The Big Sandy Rancheria Band of Western Mono Indians (the "Tribe") is a federally-recognized Indian tribe with offices located on the Big Sandy Rancheria in Auberry, California.  (*Id.* at ¶ 17.)  BSRE is a tribal corporation incorporated under section 17 of the Indian Reorganization Act, 25 U.S.C. § 5124 ("IRA"), which authorizes the Secretary of the Interior to issue a charter of incorporation to any Indian tribe upon petition by such tribe.  (*Id.* at ¶ 92.)  Although only BSRE, and not the Tribe, is a plaintiff to the instant action, BSRE alleges that corporations created pursuant to section 17 of the IRA are "essentially alter egos of the tribal government."  (*Id.* at ¶ 13) (quotation omitted).

In July 2012, in accordance with its charter, BSRE established four subdivisions:  (1) Big Sandy Distributing, which is organized to engage in the wholesale distribution of tobacco

products to Indian tribes and Indian-owned entities in Indian Country; (2) Big Sandy Distribution,[1] which is organized to engage in the distribution of tobacco products to non-Indian owned entities in the United States; (3) Big Sandy Manufacturing, which is organized to engage in the manufacture of tobacco products on the Big Sandy Rancheria; and (4) Big Sandy Importing, which is organized to engage in the importation of tobacco and tobacco products onto the Big Sandy Rancheria. (*Id.* at ¶¶ 97–115.) Plaintiff alleges that Big Sandy Distribution has not made any sales of tobacco products, and that Big Sandy Manufacturing does not currently manufacture tobacco products, but intends to do so upon issuance and receipt of the Manufacturer of Tobacco Products permit. (*Id.* at ¶¶ 105, 121.)

Through Big Sandy Importing and Big Sandy Distributing, BSRE purchases tobacco products for non-retail sale exclusively from Indian manufacturers in Indian Country. (*Id.* at ¶¶ 117, 119, 120.) At the time of the filing of the FAC, BSRE purchased tobacco products from two manufacturers: (1) Azuma Corporation, a corporation formed under the laws of and wholly owned by the Alturas Indian Rancheria, a federally-recognized Indian tribe with offices located on the Alturas Indian Rancheria, 901 County Road 56, Alturas, California; and (2) Grand River Enterprises Six Nations, Ltd. ("Grand River Enterprises"), a Canadian corporation wholly-owned by members of the Six Nations of the Grand River, a recognized First Nation of Canada, with offices located on the Six Nations of the Grand River Reserve, 2176 Chiefswood Road, Ohsweken, Ontario, Canada.[2] (*Id.* at ¶ 117.) Big Sandy Importing imports tobacco products exclusively from Grand River Enterprises exclusively for resale to Big Sandy Distributing. (*Id.* at ¶ 119.) Big Sandy Distributing purchases other tobacco products exclusively from Azuma Corporation. (*Id.* at ¶ 120.) All tobacco products purchased by Big Sandy Distributing are purchased and received at its warehouse facilities on the Tribe's reservation in Auberry, California. (*Id.* at ¶ 122.) Big Sandy Distributing then resells and distributes those tobacco

---

[1] Though similar in name, plaintiff alleges that Big Sandy Distributing differs from Big Sandy Distribution. (*Id.* at ¶ 103.)

[2] In its reply to CDTFA's motion to dismiss for lack of jurisdiction, plaintiff represents that it no longer imports Grand River Enterprises cigarettes, and only sells them to the extent that plaintiff has any remaining stock on hand. (Doc. No. 20 at 9.)

products exclusively to Indian reservation-based retailers operating within Indian Country within the geographical limits of the State of California. (*Id.* at ¶ 123.)

Between 2011 and 2016, the California Attorney General sent written correspondence to Big Sandy Distributing claiming that it was in violation of various California laws. (*Id.* at ¶¶ 134–61.) In its July 12, 2016 letter to Tribal Chairperson Elizabeth Kipp, for example, the State alleged that: (1) Big Sandy Distributing sells cigarettes not listed on the Tobacco Directory; (2) the manufacturers of the cigarettes sold by Big Sandy Distributing are not licensed by the State; (3) Big Sandy Distributing does not have a license to import or distribute cigarettes or other tobacco products in the State; (4) Big Sandy Distributing has not collected and remitted taxes due to the State on its taxable distributions; and (5) Big Sandy Distributing does not have a State-issued permit to transport untaxed cigarettes. (*Id.* at ¶ 160; Doc. No. 13-11.) BSRE alleges that the State seeks to force tribes to comply with the MSA and California's implementation thereof in order to "protect Big Tobacco and maintain Big Tobacco's sales volumes and market share through compelled price parity." (FAC at ¶ 162.)

## D. Procedural History

On July 13, 2018, BSRE filed a complaint for declaratory and injunctive relief against defendants Xavier Becerra, in his official capacity as Attorney General of the State of California, and Nicolas Maduros, in his official capacity as Director of the CDTFA. (Doc. No. 1.) BSRE filed a first amended complaint on October 8, 2018. (Doc. No. 13.) Therein, BSRE brings the following five causes of action, alleging: (1) federal common law and tribal sovereignty preempt the application to it of the State's Complementary Statute; (2) the Indian Trader Statutes preempt the application to it of the State's Complementary Statute; (3) federal common law and tribal sovereignty preempt application to it of the State's licensing requirements; (4) the Indian Trader Statutes preempt the application to it of the State's licensing requirements; and (5) federal law and tribal sovereignty preempt application to it of the State's Cigarette Tax Law. (*Id.* at ¶¶ 163–97.) BSRE seeks a declaration that the Complementary Statute, Licensing Act, and Cigarette Tax Law are preempted by federal law, as well as an injunction against defendants from enforcing, applying, or implementing such laws against it. (*Id.* at 36.)

On October 22, 2018, the California Attorney General filed a motion to dismiss for failure to state a claim and CDTFA filed a motion to dismiss for lack of jurisdiction. (Doc. Nos. 15, 16.) BSRE filed its oppositions on January 8, 2019. (Doc. Nos. 20, 21.) Defendants filed replies on January 24 and January 25, 2019. (Doc. Nos. 23, 24.)

The court held a hearing on the motions on April 16, 2019 and took the matter under submission. (Doc. No. 32.) On May 17, 2019, plaintiff filed a request for leave to file supplemental briefing, which the court granted. (Doc. Nos. 35, 36.) On May 31, 2019, plaintiff filed its supplemental brief. (Doc. No. 41.) On June 7, 2019, defendants filed a joint supplemental response. (Doc. No. 42.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Though Rule 8(a) does not require detailed factual allegations, a plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Love v. United States*, 915 F.2d 1242, 1245 (9th Cir. 1989). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *U.S. ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986). It is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that the defendants have violated the . . . laws in ways that have not

been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

## ANALYSIS

**A.      Defendants' Motion to Dismiss the Fifth Cause of Action for Lack of Jurisdiction**

The Attorney General and CDTFA each move to dismiss plaintiff's fifth cause of action, which "seeks a judicial declaration that the Tribe has no liability—either directly or pursuant to a collection and remittance requirement—for the taxes imposed under the Cigarette and Tobacco Products Tax Law for the cigarettes and tobacco products it distributes." (FAC at ¶ 197.) Defendants contend that under the Tax Injunction Act ("TIA"), the court lacks jurisdiction to issue declaratory or injunctive relief enjoining, suspending, or restraining the collection of state taxes. (Doc. No. 15-1 at 18–21; Doc. No. 16-1 at 7–9.)

The TIA provides that "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. This provision applies to both declaratory and injunctive relief. *California v. Grace Brethren Church*, 457 U.S. 393, 408–09 (1982). The Supreme Court has recognized that the principal purpose of the TIA is "to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Id.* (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 522 (1981)).

Defendants argue that plaintiff's fifth cause of action challenging the application to it of the Cigarette Tax Law is prohibited by the TIA. According to defendants, this court is divested of jurisdiction because the Supreme Court and the Ninth Circuit Court of Appeals have repeatedly held that California's tax procedures provide "a plain, speedy and efficient remedy." *See Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 338 (1990) ("To the extent they are available, California's refund procedures constitute a plain, speedy, and efficient remedy."); *Grace Brethren Church*, 457 U.S. at 414 n.31, 417 (holding that remedy under California state law was "plain, speedy and efficient" within the meaning of the TIA where appellees could seek a refund of their state unemployment insurance taxes, and noting that "the California administrative and judicial scheme for challenging a tax assessment is remarkably similar to the Illinois scheme

8

that we upheld in *Rosewell* as 'plain, speedy and efficient'"); *Jerron W., Inc. v. Cal. State Bd. of Equalization*, 129 F.3d 1334, 1339 (9th Cir. 1997) ("The Supreme Court and this court have concluded that California's tax refund remedy is generally a 'plain, speedy and efficient' remedy under the Act."); *Mandel v. Hutchinson*, 494 F.2d 364, 367 (9th Cir. 1974) ("We have held previously that the California refund procedure is a plain, speedy and efficient remedy.").

Plaintiff argues that the TIA does not bar its fifth cause of action for two reasons: (1) the relief that plaintiff seeks would not altogether halt the State's collection of taxes due on cigarettes distributed by BSRE, but would merely declare that the tax falls on the cigarette consumer, and that the responsibility to collect and remit the tax to the State falls on the retailer, not on BSRE; and (2) Indian tribes are exempt from the TIA. (Doc. No. 20 at 13.) The court considers each argument in turn below.

### 1. Whether the Tax Injunction Act Applies to Plaintiff's Fifth Cause of Action

Plaintiff first asserts that the TIA does not bar every suit that "merely inhibits" or has a "negative impact" on the assessment, levy, or collection of a state tax, but that the key inquiry "is whether the relief to some degree *stops* 'assessment, levy or collection.'" (*Id.*) Because the relief sought here would not *stop* the State's collection of taxes owed by the taxpayer, plaintiff argues that its fifth cause of action does not fall within the TIA's scope. (*Id.*) The sole authority plaintiff relies on in support of its proposition that the TIA applies only where the requested relief would "stop" the State's collection of taxes is the decision in *Direct Marketing Association v. Brohl*, ___ U.S. ___, 135 S. Ct. 1124 (2015).

An examination of the facts in *Brohl*, however, reveals that it is of limited relevance to this case. The plaintiff in *Brohl* challenged a Colorado law imposing notice and reporting requirements on retailers who did not collect sales tax. *Id.* at 1127–28. In that context the Supreme Court held that the TIA did not bar plaintiff's suit, because "[t]he TIA is keyed to the acts of assessment, levy, and collection themselves, and enforcement of the notice and reporting requirements is none of these." *Id.* at 1131. Here, in contrast, plaintiff BSRE seeks a declaration that it has no liability for the taxes imposed under California's Cigarette Tax Law. The Cigarette Tax Law, unlike the notice and reporting requirements in *Brohl*, is clearly an act of "assessment,

levy or collection," *see supra* at 2, and thus falls squarely within the scope of the TIA's prohibition.

2. Whether Plaintiff Is Exempt from the Tax Injunction Act under 28 U.S.C. § 1362

Plaintiff next asserts that the TIA's prohibition does not extend to it because district courts have original jurisdiction "of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1362; *see also Moe v. Confederated Salish & Kootenai Tribes of Flathead Reservation*, 425 U.S. 463, 470–74 (1976) (recognizing an exemption from the TIA for Indian tribes under 28 U.S.C. § 1362). Although the Tribe is not a party to this action, plaintiff argues that the Tribe and BSRE "are nothing but two faces of the same Tribe, each possessing the Tribe's right to test in federal court a state tax system's compliance with federal law." (Doc. No. 20 at 12.) Plaintiff contends that this conclusion necessarily follows from the decision in *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 (1973). There, the Supreme Court found that, although it was unclear from the record whether the Mescalero Apache Tribe had incorporated itself under section 17 of the IRA, or if it was operating as the constitutional entity organized under section 16 of the IRA, "[i]n any event, the question of tax immunity cannot be made to turn on the particular form in which the Tribe chooses to conduct its business." *Id.* at 157 n.13.

In a supplemental brief filed with this court, plaintiff corrected its allegations in the FAC that the Big Sandy Rancheria Band of Western Mono Indians was constitutionally organized under section 16 of the IRA, clarifying that on June 8, 1935, the Tribe had in fact voted against the application of the IRA.[3] (Doc. No. 41 at 6.) The Tribe adopted its non-IRA constitution under its inherent sovereign power and rejected the need for approval of its constitution by the

---

[3] The court notes that, in ruling on a motion to dismiss under Rule 12(b)(6), "a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss." *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998); *accord Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1154 (E.D. Cal. 2017). Here, even considering plaintiff's corrected allegations in its supplemental brief, the mechanism by which the Tribe established its governing body has no bearing on the court's analysis below because it is not a party to this action.

Secretary of the Interior.  (*Id.*)  Plaintiff argues that, notwithstanding the Tribe's rejection of the IRA, the Secretary nonetheless issued a section 17 charter to plaintiff BSRE.  (*Id.* at 7) (citing 25 U.S.C. § 5126, which provides that the Secretary may issue a charter of incorporation to a tribe despite the tribe's vote against the IRA's application).  According to plaintiff, the Secretary's issuance of the section 17 charter to BSRE renders BSRE "duly recognized by the Secretary of the Interior," and therefore qualifies it for exemption under 28 U.S.C. § 1362.  (*Id.*)

Defendants do not dispute that Indian tribes are exempt from the TIA's prohibition, but do dispute that plaintiff BSRE is equivalent to an Indian tribe.  Defendants argue that BSRE, as a corporation organized under section 17 of the IRA, is a distinct entity from the Big Sandy Rancheria Band of Western Mono Indians—regardless of how the latter is constitutionally organized—and that BSRE therefore cannot invoke the Tribe's jurisdiction under 28 U.S.C. § 1362 or its exemption from the TIA.

The court observes that, in plaintiff's original complaint, it alleged that BSRE "is a federally-chartered corporation" "wholly owned by the Big Sandy Rancheria Band of Western Mono Indians."  (Doc. No. 1 at ¶¶ 9, 79, 80.)  After defendants filed their initial motions to dismiss, arguing, as they do here, that the court lacked jurisdiction over plaintiff's tax challenge pursuant to the TIA (*see* Doc. Nos. 10, 11), plaintiff filed a FAC that ostensibly attempts to obfuscate the distinction between itself and the Tribe.  (*Compare* Doc. No. 1 at 1, 3 (defining the Big Sandy Rancheria Band of Western Mono Indians as the "Tribe" and describing BSRE as "wholly owned" by the Tribe), *with* FAC at 1 & ¶ 10 (defining both BSRE and the Big Sandy Rancheria Band of Western Mono Indians as the "Tribe")).  Notwithstanding the artful pleading of the FAC, the Supreme Court and others have consistently recognized that a tribal corporation organized under section 17 of the IRA is legally distinct from the governing body organized under section 16 of the IRA.[4]  *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 145–46 (1982) (distinguishing between tribe's "role as a commercial partner" and its "role as sovereign");

---

[4]  Here, the Tribe is not organized under section 16 of the IRA.  Nonetheless, there would appear to be no reason why the distinction between the constitutional body and the section 17 corporation would not apply under these circumstances.

*Linneen v. Gila River Indian Cmty.*, 276 F.3d 489, 492–93 (9th Cir. 2002) ("Most courts that have considered the issue have recognized the distinctness of these two entities.") (citing *Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982)).

An opinion by the Department of the Interior reinforces this distinction.[5]  The Commission of Indian Affairs requested an opinion from the Office of the Solicitor as to whether an Indian tribe organized pursuant to section 16 of the IRA was the same legal entity as the incorporated tribe chartered pursuant to section 17.  *See Atkinson v. Haldane*, 569 P.2d 151, 172 (Alaska 1977) (discussing opinion).  The Solicitor found:

> The purpose of Congress in enacting section 16 of the Indian Reorganization Act was to facilitate and to stabilize the tribal organization of Indians residing on the same reservation, for their common welfare.  It provided their political organization.  The purpose of Congress in enacting section 17 of the Indian Reorganization Act was to empower the Secretary to issue a charter of business incorporation to such tribes to enable them to conduct business through this modern device, which charter cannot be revoked or surrendered except by act of Congress.  This corporation, although composed of the same members as the political body, is to be a separate entity, and thus more capable of obtaining credit and otherwise expediting the business of the tribe, while removing the possibility of federal liability for activities of that nature.  As a result, the powers, privileges and responsibilities of these tribal organizations materially differ.

*Id.* (as quoted).

Because BSRE, as a section 17 incorporated tribe, is a distinct entity from the Tribe in its constitutional form, the court concludes that BSRE is not exempt from the TIA's jurisdictional bar.  The Ninth Circuit has held that "[s]ection 1362 makes no provision for wholly controlled or owned subordinate economic tribal entities, nor did the Supreme Court in *Moe* suggest that section 1362 provided for jurisdiction beyond the plain language of the statute, that is, beyond Indian tribes or bands."  *Navajo Tribal Util. Auth. v. Ariz. Dep't of Revenue*, 608 F.2d 1228, 1231 (9th Cir. 1979).  In *Navajo*, the Ninth Circuit made clear that "[s]uits brought by tribal corporations have . . . been found to fall outside the scope of section 1362. . . . Native

---

[5]  The opinion of the Solicitor is entitled to great weight.  *See United States v. Jackson*, 280 U.S. 183, 193 (1930) ("It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration.").

corporations are not tribes or bands." *Id.* at 1231 (citation and quotation marks omitted). In that same opinion, the Ninth Circuit rejected the argument that plaintiff puts forth here relying on *Mescalero*, holding that *Mescalero* "speaks only to the question of tax immunity, not to the question of federal jurisdiction." *Id.* at 1233.

Plaintiff attempts to distinguish the Ninth Circuit's holding in *Navajo* that tribal corporations fall outside the scope of § 1362 by arguing that the court in *Navajo* did not specifically address section 17 tribal corporations. (Doc. No. 41 at 8–12.) Plaintiff contends that the plaintiff corporation in *Navajo* was a "subordinate" and "semi-autonomous" entity that was not synonymous with the tribal council, and that there was no indication that the tribal council had authorized the corporation's litigation. (*Id.* at 11.) Plaintiff argues that here, in contrast, its Board and the Tribe are synonymous because they are composed of the exact same members, and that there is therefore no concern that plaintiff's interests diverge from those of the Tribe. (*Id.* at 11–12.) The court acknowledges that the plaintiff corporation and the Tribe in this case have a much closer relationship than the tribe and the corporation in *Navajo*. Nonetheless, the holding in *Navajo* did not hinge on the overlap of interests between the political and corporate entities. In fact, the plaintiff corporation in *Navajo* argued that it sought to protect interests identical to those of the tribe. *Navajo*, 608 F.2d at 1234. Still, the Ninth Circuit noted that the tribe had chosen not to join the litigation, and that even if the corporation's interests were identical to the tribe's, "the Tribe itself will be able to protect those interests, should its leadership decide to do so." *Id.* at 1233–34.

Finally, the plain language of § 1362 indicates that jurisdiction is only conferred on the district courts when an action is brought by an "Indian tribe or band with a governing body duly recognized by the Secretary of the Interior." Plaintiff argues that, by its terms, the statute does not distinguish between an "Indian tribe or band" organized under section 16 or section 17 of the IRA, and that this failure to expressly limit § 1362 to actions brought by tribes in their governmental capacity suggests that Congress intended the provision to apply to incorporated tribes as well. (Doc. No. 41 at 12–13.) Furthermore, plaintiff argues that nothing in the legislative history of § 1362 indicates that it was intended to apply only to tribes acting in a

governmental capacity, even though Congress was aware when it passed § 1362 that Indian tribes could act in both sovereign and proprietary capacities.  (*Id.*)  These same arguments were articulated long ago by Judge Betty Fletcher in her dissent in *White Mountain Apache Tribe v. Williams*, 810 F.2d 844, 868 (9th Cir. 1985) (Fletcher, J., dissenting).  The fact that the majority opinion in that case neither reached nor adopted the reasoning of that dissent, nor has any other court as far as the undersigned can determine, is telling.

Even accepting for the sake of argument that BSRE qualifies as an "Indian tribe or band," plaintiff provides no authority for the proposition that it has "a governing body duly recognized by the Secretary of the Interior."  The allegations of plaintiff's own complaint acknowledge that it is "Big Sandy Rancheria of Western Mono Indians of California", not BSRE, that is recognized by the Bureau of Indian Affairs.  (FAC at ¶ 17.)  In its supplemental brief in opposition to the pending motion to dismiss, plaintiff argues for the first time that it has a Secretarially-recognized governing body because it is governed by a Board of Directors that is one and the same as the constitutional Tribal Council, and that the Tribal Council is recognized by the Secretary.  (Doc. No. 41 at 12–13.)  Even if the court were to consider this new argument,[6] plaintiff has not provided, and the court has not found, any authority supporting it.  As defendants note (Doc. No. 42 at 5–6), recognition of a tribe's governing body has a specific meaning.  In passing the law creating the published list of recognized tribes, Congress explained:

> "Recognized" is more than a simple adjective; it is a legal term of art.  It means that the government acknowledges as a matter of law that a particular Native American group is a tribe by conferring a specific legal status on that group, thus bringing it within Congress' legislative powers.  This federal recognition is no minor step.  A formal political act, it permanently establishes a government-to-government relationship between the United States and the recognized tribe as a "domestic dependent nation," and imposes on the government a fiduciary trust relationship to the tribe and its members.

H.R. REP. No. 103-781, at 2 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3768, 3769 (footnote

---

[6]  As noted above, "[i]n determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss."  *Schneider*, 151 F.3d at 1197 n.1.

omitted). The court is unpersuaded that merely because the Tribal Council qualifies for this "specific legal status" that BSRE's Board of Directors necessarily qualifies as well.

Federal courts possess only limited jurisdiction, and "statutory jurisdictional doubts are to be resolved against federal jurisdiction." *Navajo Tribal Util. Auth.*, 608 F.2d at 1233. Considering the material differences in the powers of the tribe as a political entity versus a corporate entity, the Ninth Circuit's holding in *Navajo*, and the language of § 1362, the court concludes that plaintiff's challenge to the State's Cigarette Tax Law is barred by the TIA. Plaintiff's fifth cause of action will therefore be dismissed for lack of subject matter jurisdiction.

**B.     The Motion to Dismiss the Remaining Causes of Action for Failure to State a Claim**

Plaintiff's remaining causes of action contend that the State's Complementary Statute and licensing requirements are preempted by federal common law and the principal of tribal sovereignty, as well as the federal Indian Trader Statutes, 25 U.S.C. §§ 261–264. California's Attorney General argues that plaintiff's claims in this regard fail as a matter of law.

1.     State Regulation and Tribal Sovereignty

Before turning to the merits of the pending motion, the court pauses to summarize the preemption principles governing state regulatory authority over tribal affairs. Historically, the notion of Indian communities as semi-independent nations meant that states could not impose their laws on Indians living in Indian country. *See Worcester v. Georgia*, 31 U.S. 515, 520 (1832) ("[T]he laws of [a state could] have no force . . . but with the assent of the [Indians] themselves, or in conformity with treaties, and with the acts of congress."). Since that time, however, "Congress has to a substantial degree opened the doors of reservations to state laws." *Organized Vill. of Kake v. Egan*, 369 U.S. 60, 74 (1962); *see also White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 141 (1980) ("Long ago the Court departed from Mr. Chief Justice Marshall's view that 'the laws of [a State] can have no force' within reservation boundaries.") (quoting *Worcester*, 31 U.S. at 520); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 171 (1973) ("[N]otions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians."). Thus, the bright line recognized in the early nineteenth century has yielded to the modern view, which recognizes that "[w]hile they are sovereign for

15

some purposes, it is now clear that Indian reservations do not partake of the full territorial sovereignty of States or foreign countries." *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 165 (1980). Nonetheless, "Indian tribes retain attributes of sovereignty over both their members and their territory," *Bracker*, 448 U.S. at 142 (citation and quotation marks omitted), and still have the right "to make their own laws and be governed by them." *Nevada v. Hicks*, 533 U.S. 353, 361 (2001).

A substantial body of Supreme Court case law has developed in this area, such that there is no longer a rigid rule "by which to resolve the question whether a particular state law may be applied to an Indian reservation or to tribal members." *Bracker*, 448 U.S. at 142. Congressional authority to regulate tribal affairs under the Indian Commerce Clause and the semi-independent position of Indian tribes have given rise to "two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Id.* First, the exercise of state authority may be preempted by federal law; and second, the exercise of state authority may unlawfully infringe on the right of tribal self-government. *Id.* As the Supreme Court explained in *Bracker*:

> The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important backdrop against which vague or ambiguous federal enactments must always be measured.

*Id.* at 143 (internal citation and quotation marks omitted).

The key factors in applying these principles to the area of state taxation are (1) who is being regulated and (2) where the activity to be regulated takes place. *See Wagnon v. Prairie Band Potawatomi Nation*, 546 U.S. 95, 101 (2005) ("[U]nder our tax immunity cases, the 'who' and the 'where' of the challenged tax have significant consequences."); *see also Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1171 (10th Cir. 2012) ("Application of the preemption and infringement barriers depends on the factors of 'who'—Indians or non-Indians—and 'where'—in or outside the tribe's Indian country.").

16

When the conduct to be regulated occurs on reservation and involves only Indians, "state law is generally inapplicable, for the State's regulatory interest is likely to be minimal and the federal interest in encouraging tribal self-government is at its strongest." *Bracker*, 448 U.S. at 144.

In contrast, when a state asserts authority over the conduct of non-Indians engaging in activity on tribal lands, courts must undertake a fact-specific balancing test. *Bracker*, 448 U.S. at 144–45. The Supreme Court held in *Bracker* that "[t]his inquiry is not dependent on mechanical or absolute conceptions of state or tribal sovereignty, but has called for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." *Id.*; *see also Wagnon*, 546 U.S. at 110–11 (specifying that the *Bracker* interest-balancing test applies "only where the legal incidence of the tax [falls] on a nontribal entity engaged in a transaction with tribes or tribal members . . . on the reservation") (citation and quotation marks omitted).

Finally, when Indians go "beyond reservation boundaries," absent express federal law to the contrary, they are "subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero*, 411 U.S. at 148–49. In such circumstances, the *Bracker* interest-balancing test is inapplicable. *Wagnon*, 546 U.S. at 113.

### 2. Plaintiff's Challenge to the State's Complementary Statute

As explained above, the Complementary Statute, or Directory Statute, requires non-participating manufacturers to the MSA to provide assurances to the California Attorney General's Office that they will meet their obligations under the Escrow Statute. *See* Cal. Rev. & Tax. Code § 30165.1(b). Manufacturers that provide such assurances are placed on the Tobacco Directory, and their cigarettes may be sold to consumers in the State. *Id.* § 30165.1(c). A manufacturer's failure to meet its obligations or provide such assurances, however, renders its cigarettes contraband, unlawful for sale to consumers and forfeitable to the State. *See id.* § 30436(e).

Here, plaintiff asserts that the State has accused it of distributing "off-directory" cigarettes in violation of the Complementary Statute. (FAC at ¶ 156; Doc. No. 13-10 at 3.) Plaintiff alleges

17

in its first and second causes of action that the State's Complementary Statute may not be applied to its sales activities because BSRE exclusively distributes tobacco products to Indian tribes and Indian tribal members on their respective reservations. According to plaintiff, "because BSRE distributes to Indian purchasers in Indian country, the Indian Trader Statues and the policy of leaving Indians free from State jurisdiction and control preemptively govern such sales, leaving no room for the State's Directory Statute to dictate which products BSRE may sell or the prices it must charge." (Doc. No. 21 at 10.)

California's Attorney General argues that the Complementary Statute validly restricts the kinds of cigarettes plaintiff may sell to the public. Even accepting as true that BSRE only distributes to other Indian tribes or tribal members within Indian Country, the Attorney General contends that when BSRE is "going beyond reservation boundaries," it is subject to, and must comply with, "nondiscriminatory state law otherwise applicable to all citizens of the State." (Doc. No. 24 at 10–11) (quoting *Mescalero*, 411 U.S. at 148–49). Unless expressly prohibited by federal law, activities conducted by Indians off the reservation are subject to non-discriminatory state laws. *See Mescalero*, 411 U.S. at 148–49 ("Absent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State."); *see also Bracker*, 448 U.S. at 144 n.11 ("In the case of Indians going beyond reservation boundaries, . . . a nondiscriminatory state law is generally applicable in the absence of express federal law to the contrary.") (citation and quotation marks omitted).

The court must therefore determine whether BSRE's sales activities can properly be deemed as "going beyond reservation boundaries." As alleged in the FAC, BSRE currently purchases tobacco products from two manufacturers, Azuma Corporation, located in Alturas, California, and Grand River Enterprises, located in Ontario, Canada. (FAC at ¶ 117.) All tobacco products purchased by Big Sandy Distributing are purchased and received at its warehouse facilities on the Tribe's reservation in Auberry, California. (*Id.* at ¶ 122.) Big Sandy Distributing then resells and distributes those tobacco products exclusively to Indian reservation-based retailers operating in Indian Country within the State. (*Id.* at ¶ 123.) These transactions

clearly extend beyond the boundaries of a single reservation.  Moreover, defendant contends that these transactions necessarily involve "off-reservation" activity because plaintiff distributes goods to buyers located on other reservations, and the Big Sandy Rancheria does not border any other reservation.  (Doc. No. 15-1 at 23.)  Plaintiff argues, however, that its transactions are distinguishable from the "off-reservation" activities in *Mescalero*.  (Doc. No. 21 at 13.)  Plaintiff points out that in *Mescalero*, the Mescalero Apache Tribe had opened a ski resort adjacent to, but completely outside the boundaries of the tribe's reservation.  *See Mescalero*, 411 U.S. at 146. Here, in contrast, BSRE emphasizes that it "exclusively distributes tobacco products to Indian tribes and Indian tribal members on their land" and does not make any sales to non-members or the general public.  (Doc. No. 21 at 11.)

Notably, tribe-to-tribe transactions involving the movement of goods through a State, including outside of Indian country, are not immune from state regulation.  Indeed, many courts have affirmed states' off-reservation authority to enforce state laws.  *See, e.g.*, *Colville*, 447 U.S. at 161–62 (authorizing off-reservation seizures, noting "[i]t is significant that these seizures take place outside the reservation, in locations where state power over Indian affairs is considerably more expansive than it is within reservation boundaries"); *Narragansett Indian Tribe v. Rhode Island*, 449 F.3d 16, 21 (1st Cir. 2006) ("It is beyond peradventure that a state may seize contraband located outside Indian lands but in transit to a tribal smoke shop.").  According to defendant, these cases demonstrate that, even if plaintiff distributes tobacco products only to other Indian tribes and tribal members on their own reservations, this activity nonetheless takes place "off-reservation," such that the State is empowered to enforce its laws with respect to such activity.  *See State ex rel. Edmondson v. Native Wholesale Supply*, 237 P.3d 199, 216 (Okla. 2010) ("The entire process comprising these sales thus takes place in multiple locations both on and off different tribal lands.  This is not on-reservation conduct . . . , but rather off-reservation conduct by members of different tribes.").

The Tenth Circuit decision in *Muscogee (Creek) Nation v. Pruitt* is instructive in this regard.  There, just as here, Oklahoma had enacted statutes requiring tobacco product manufacturers to either enter into and make payments to the state under the MSA, or to pay a

certain percentage of each sale into an escrow fund. *Muscogee*, 669 F.3d at 1164–65. Any brand of cigarette produced by a manufacturer that did not comply with those requirements was deemed contraband. *Id.* Muscogee (Creek) Nation ("MCN") objected to those requirements as violative of tribal sovereignty and the federal Indian Trader Statutes.

The Tenth Circuit held that MCN "fails to state a plausible claim that [Oklahoma's] Escrow Statue and Complementary Act are preempted by federal law or infringe on its tribal sovereignty." *Id.* at 1183. Relying on the Supreme Court decisions in *Mescalero* and *Colville*, the Tenth Circuit found that "when Indians ('who') act outside of their own Indian country ('where'), *including within the Indian country of another tribe*, they are subject to non-discriminatory state laws otherwise applicable to all citizens of the state." *Id.* at 1172 (emphasis added) (citing *Mescalero*, 411 U.S. at 148–49; *Colville*, 447 U.S. at 161). The Tenth Circuit went on to hold that "[n]othing in the Indian Trader Statutes specifically preempts the Escrow Statute or the Complementary Act," and noted that the Supreme Court had previously held that the Indian Trader Statutes "do not bar the States from imposing reasonable regulatory burdens upon Indian traders for enforcement of valid state taxes." *Id.* at 1181–82 (quoting *Milhelm*, 512 U.S. at 74 (brackets omitted)). Moreover, the Tenth Circuit in *Muscogee* found that the "ancillary effect" of the enforcement of these statutes was simply that MCN's members could not buy contraband cigarettes, and that "such an indirect effect does not establish a preemption or an infringement of tribal sovereignty claim." *Id.* at 1183.

Plaintiff in this case attempts to distinguish the holding in *Muscogee* on the ground that the tax and regulatory scheme at issue in that case is "substantially different" from that of California, because "California, unlike Oklahoma, recognizes that the applicability of the Directory Statute is directly tied to whether the cigarettes are sold in a manner that is exempt from California's excise taxes," and further, "unlike Oklahoma, California's cigarette excise taxes do not arise until the cigarettes are distributed to an individual or entity that is obligated to pay the excise tax." (Doc. No. 21 at 16.) To this court, these appear to merely be distinctions without a difference. Plaintiff fails to articulate how these distinctions were dispositive or even relevant to the Tenth Circuit's thorough analysis in *Muscogee*.

Moreover, contrary to plaintiff's assertion, the Indian Trader Statutes do not expressly prohibit the application of the Complementary Statute to plaintiff's off-reservation activities. Congress enacted the Indian Trader Statutes "to prevent fraud and other abuses by persons trading with Indians." *Milhelm*, 512 U.S. at 70. Among other provisions, the Indian Trader Statutes provide that "the Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261. Plaintiff asserts that this federal law establishes that a state has no right to impose taxes or other burdens on the transactions between Indian traders and the Indian tribes and tribal members with whom they deal. (Doc. No. 21 at 14–15.) However, the only authority cited by plaintiff for this proposition are the decisions in *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685 (1965), and *Central Machinery Co. v. Arizona State Tax Commission*, 448 U.S. 160 (1980). (*Id.*) Since those decisions were issued, however, the Supreme Court has specifically clarified that "[a]lthough language in *Warren Trading Post* suggests that no state regulation of Indian traders can be valid, our subsequent decisions have 'undermine[d]' that proposition." *Dep't of Taxation and Fin. of N.Y. v. Milhelm Attea & Bros., Inc.*, 512 U.S. 61, 71 (1994) (citing *Central Machinery*, 448 U.S. at 172 (Powell, J., dissenting)). In fact, the Supreme Court went on to explain that the state law found to be preempted in *Warren Trading Post* "was a tax directly 'imposed upon Indian traders for trading with Indians. . . . That characterization does not apply to regulations designed to prevent circumvention of 'concededly lawful' taxes owed by non-Indians." *Id.* at 74–75 (citations omitted). The Supreme Court in *Milhelm* thus concluded, decades after the decision in *Warren Trading Post*, that "Indian traders are not wholly immune from state regulation that is reasonably necessary to the assessment or collection of lawful state taxes." *Id.* at 75.

Plaintiff next argues that the State's Complementary Statute is *not* a "regulation that is reasonably necessary to the assessment or collection of lawful state taxes" under *Milhelm*, because it is not a tax at all—rather, it is designed to compel enforcement of the Escrow Statute, which in turn is designed to neutralize the cost disadvantages that participating manufacturers to

21

the MSA experience vis-à-vis their non-participating counterparts.  (Doc. No. 21 at 15–16.)  This argument advanced by plaintiff overlooks the fact that in *Milhelm* and in other cases, the Supreme Court has upheld state regulations that were not taxes strictly speaking, but were incidental enforcement measures aimed at ensuring collection of lawful state taxes.  *See Milhelm*, 512 U.S. at 64–67 (upholding New York regulatory scheme imposing recordkeeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians); *Colville*, 447 U.S. at 159–60 (upholding Washington State cigarette tax enforcement scheme requiring tribal retailers selling goods on the reservation to collect taxes on sales to nonmembers and to keep extensive records of those transactions); *Moe*, 425 U.S. at 481–83 (upholding Montana law requiring Indian retailers on tribal land to collect a state cigarette tax imposed on sales to non-Indian consumers).

In sum, the court concludes that BSRE's sales constitute off-reservation activities that, unless expressly prohibited by federal law, are subject to non-discriminatory state laws otherwise applicable to all citizens of the state.  Plaintiff has not alleged that the Complementary Statute is discriminatory in any way, and otherwise fails to allege facts that if proven would show that the Statute is expressly prohibited by federal law.  Accordingly, plaintiff's challenge to the State's Complementary Statute fails as a matter of law.

### 3.  Plaintiff's Challenge to the State's Licensing Requirements

Plaintiff asserts in its third and fourth causes of action that the State lacks authority to require it to possess State-issued licenses or make regular reports of its in-state sales.

Although plaintiff acknowledges that states may impose "a minimal burden" on tribal sellers on their reservation "designed to avoid a likelihood in its absence non-Indians . . . will avoid payment of a concededly lawful tax," *Moe*, 425 U.S. at 483, plaintiff contends that California's licensing requirements are not designed or reasonably tailored to achieve that goal.  In its supplemental brief in opposition to the pending motion to dismiss, plaintiff argues that none of the reports it would be required to file under the State's reporting regime would aid the CDTFA or the California Attorney General in their efforts to track plaintiff's downstream sales, because the required reports do not provide information regarding the identity of the persons or

22

entities that purchase the tax-exempt cigarettes.  (Doc. No. 41 at 14–21.)  Plaintiff argues, therefore, that the Attorney General "has very little interest to place on the scale opposite the federal and tribal interests in Indian sovereignty and the Congress's overriding goal of self-government, self-determination, self-sufficiency and economic development."  (*Id.* at 20.)

The Attorney General disputes this characterization, insisting that California's licensing program ensures that cigarettes distributed in the State are "within the licensed distribution chain by requiring participants at each level to hold a license, transact business with other license holders, and either make regular reports of sales and distributions or maintain records CDTFA could use to confirm such reports."  (Doc. No. 15-1 at 24.)  The Attorney General contends that even if all of plaintiff's transactions are exempt from taxation, the State nonetheless has an interest in tracking what happens to the cigarettes further down the distribution chain:  that is, "[e]ven if Plaintiff does not owe the tax, or Plaintiff's customers do not owe the tax, the State's licensing and reporting requirements allow CDTFA to see if *someone* owes the tax, and then, if they do, to collect it."  (*Id.* at 24–25.)  Specifically, the Attorney General argues that the State's licensing and reporting requirements provide two critical pieces of information relevant to plaintiff's downstream sales:  (1) how many cigarettes are brought into the State so that the State knows the potential number of taxable transactions that could occur; and (2) who plaintiff's customers are, so that the State can obtain reporting from them and collect tax if they make taxable distributions.  (Doc. No. 42 at 7.)  Plaintiff does not dispute that its reports would provide the first.  (*See* Doc. No. 41 at 17) (acknowledging that the Schedule 2A Cigarette Tax Receipt Schedule would provide "the total number of units BSRE received").[7]  With respect to the second, the Attorney General argues that although BSRE's reports would not list the identity of its customers, each of its customers' filings would list BSRE as the seller, thereby allowing the State to compare BSRE's aggregate monthly outflow with the monthly inflow reported by its

_____

[7]  Plaintiff acknowledges that the Schedule 2A Cigarette Tax Receipt Schedule would also provide the name of the person or entity that sold untaxed cigarettes to BSRE; the seller's CDTFA account number, if any; information regarding the location from which the cigarettes originated; the product brand name; whether the shipment was for cartons or packs of cigarettes; and the date of invoice and invoice number.  (Doc. No. 41 at 17.)

customers, and to follow up in the event of discrepancies. (Doc. No. 42 at 8.) Lastly, the Attorney General notes that, in addition to monthly reports, the State also requires distributors to maintain and make available for examination underlying invoices and other records supporting the required reports—and that distributors are therefore required to maintain and provide exactly the kind of information that would aid the CDTFA and the Attorney General in tracking plaintiff's downstream sales. (*Id.*) (citing statutes). At bottom, the Attorney General contends that the State's licensing and reporting requirements impose only "a minimal burden designed to avoid the likelihood that in [their] absence non-Indians purchasing from the tribal seller will avoid payment of a . . . lawful tax." (Doc. No. 15-1 at 24) (quoting *Moe*, 425 U.S. at 483).

Indeed, licensing schemes with even more demanding requirements than those of California have been repeatedly upheld by the Supreme Court as imposing only "a minimal burden." *See Milhelm*, 512 U.S. at 64–67 (upholding New York regulatory scheme imposing recordkeeping requirements and quantity limitations on cigarette wholesalers who sell untaxed cigarettes to reservation Indians); *Colville*, 447 U.S. at 159–60 (upholding Washington State cigarette tax enforcement scheme requiring tribal retailers selling goods on the reservation to collect taxes on sales to nonmembers and to keep extensive records of those transactions); *Moe*, 425 U.S. at 481–83 (upholding Montana law requiring Indian retailers on tribal land to collect a state cigarette tax imposed on sales to non-Indian consumers). Plaintiff argues that its submission of the Cigarette Distributor's Tax Report would be of little use to the State, because it would only show that "one-hundred percent of BSRE's 'distributions' were tax-exempt under the Constitution and that the taxable value of BSRE's 'distributions' would be zero." (Doc. No. 41 at 16.) However, the limited information plaintiff would be providing reinforces the notion that the reporting requirements pose a minimal burden on plaintiff. The Supreme Court has repeatedly held that "the States have a valid interest in ensuring compliance with lawful taxes that might easily be evaded through purchases of tax-exempt cigarettes on reservations; that interest outweighs tribes' modest interest in offering a tax exemption to customers who would ordinarily shop elsewhere." *Milhelm*, 512 U.S. at 73. By imposing licensing and recordkeeping requirements on distributors, California does not dictate "the kind and quantity of goods and the

prices at which such goods shall be sold to the Indians." 25 U.S.C. § 261.  Under California law,

Indian traders remain free to sell any kind and quantity of cigarettes and at any price they wish.

Plaintiff has failed to plausibly allege that compliance with the State's licensing and

recordkeeping requirements constitutes an excessive burden intruding on core tribal interests.

In its opposition to the pending motion, plaintiff disputes the relevance of the decision in

*Milhelm* to the instant case, stating only that the New York system at issue in that case "is very

different from California's cigarette tax system." (Doc. No. 21 at 28.)  That New York's

regulations are different from those of California is unconvincing, however, given that New

York's regulations—which were upheld by the Supreme Court—appear to be objectively more

onerous than those at issue here.  As the Attorney General argues in his reply, it would be

illogical for New York's more onerous regulations to *not* be preempted but for California's less

onerous regulations to *be* preempted.  (Doc. No. 24 at 15.)

Plaintiff also argues that the Supreme Court's decision in *Colville* is not instructive here

because it imposed requirements on retailers, who had a direct connection or direct transaction

with the taxable consumer.  Here, because plaintiff is a wholesaler who sells exclusively to Indian

retailers who would themselves be exempt from taxation, plaintiff argues that application of the

State's licensing requirements to it would serve no purpose.  (Doc. No. 21 at 28–29.)  Plaintiff

contends that because the licensing and reporting requirements are also imposed on the retailer,

only the records of the retailer would reveal whether a consumer owes the tax.  (*Id.* at 29.)

This argument is also unpersuasive.  In *Milhelm*, the Supreme Court explicitly rejected a

legal distinction between wholesale distributors and retailers for these purposes, observing that

"[i]t would be anomalous to hold that a State could impose tax collection and bookkeeping

burdens on reservation retailers who are themselves enrolled tribal members, . . . but that similar

burdens could not be imposed on wholesalers, who often (as in this case) are not." 512 U.S. at

74.  The Supreme Court declined to create a bright line between wholesalers and retailers,

recognizing that "[s]uch a ruling might well have the perverse consequence of casting greater

state tax enforcement burdens on the very reservation Indians whom the Indian Trader Statues

were enacted to protect." *Id.*  Even though that "perverse consequence" is not realized here,

where plaintiff is a wholesale distributor and a tribal corporation, *Milhelm* nonetheless makes clear that preemption jurisprudence does not hinge on the distinction between wholesalers and retailers. *Id.*; *accord Muscogee*, 669 F.3d at 1177 ("Requiring wholesalers, who are the stamping agents, to be []licensed helps protect the State's valid interest in preventing evasion of its valid cigarette tax."). In fact, the Supreme Court in *Milhelm* found that "because wholesale trade typically involves a comparatively small number of large-volume sales, the transactional recordkeeping requirements imposed on Indian traders in this case are probably less onerous than those imposed on retailers in *Moe* and *Coleville*." 512 U.S. at 76.

In sum, other state programs involving similar, but also more demanding, licensing and recordkeeping requirements to that of California have been upheld by the Supreme Court against preemption challenges like those brought by plaintiff in this case. Plaintiff's attempt to retread old ground will not be permitted to proceed. The court finds that plaintiff's challenge to the State's licensing requirements fails as a matter of law.

**CONCLUSION**

For the reasons set forth above,

1. The Attorney General's motion to dismiss (Doc. No. 15) and CDTFA's motion to dismiss for lack of jurisdiction (Doc. No. 16) are granted;

2. Plaintiff's fifth cause of action is dismissed for lack of jurisdiction;

3. Plaintiff's remaining causes of action are dismissed with prejudice for failure to state a claim; and

4. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

Dated:   **August 13, 2019**        _____

UNITED STATES DISTRICT JUDGE